UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| MAKE-A-WISH FOUNDATION OF RHODE ISLAND, INC.,<br>Plaintiff,<br>v.<br>MAKE-A-WISH FOUNDATION OF AMERICA,<br>Defendant. | CIVIL ACTION<br>NO. 1:08-cv-206-S |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO LIFT TEMPORARY STAY BY DEFENDANT MAKE-A-WISH FOUNDATION OF AMERICA AND OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Defendant Make-A-Wish Foundation of America ("MAWFA") hereby submits this memorandum of law (1) in support of its Motion to Lift the Temporary Stay, entered on May 20, 2008 in the Providence County Superior Court, and (2) in Opposition to Plaintiff's Motion for Preliminary Injunction.

On May 16, 2008, the Executive Committee of the Board of Directors of MAWFA, the national Make-A-Wish organization with contractual authority over all Make-A-Wish chapters, upheld the revocation of the charter of plaintiff, Make-A-Wish Foundation of Rhode Island (the "Chapter"), for intentionally submitting inaccurate information to the Internal Revenue Service ("IRS") for tax years 2005 and 2006. The Chapter admitted that it knowingly filed its IRS Form 990s without disclosing, as required by law, the compensation of the Chapter's President & CEO. The Chapter also disclosed confidential information about wish children which is not required by the IRS. Both acts violated the Chapter Agreement between the Chapter and

MAWFA, MAWFA's bylaws and MAWFA's Governing Policies, Performance Standards and Guidelines (hereafter referred to at times as the "Policies").

In compliance with the discipline process set forth in the Chapter Agreement, following a duly noticed hearing on March 12, 2008 -- during which the Chapter presented its position -- MAWFA's Chapter Performance Committee, which is comprised of volunteer members of MAWFA's board of directors and volunteer representatives from various chapters across the country, determined that revocation was the appropriate discipline.

By a unanimous vote, the CPC determined that the Chapter had violated the following provisions:

***Chapter Agreement***

*5.3 Chapter agrees to comply with, and be bound by, the terms of Foundation's Bylaws, this Agreement and the Policies.*

*5.4 Chapter shall use its best efforts in performing the Foundation's Purpose, in cooperating with Foundation and Other Chapters, and in protecting the Marks and the integrity and good reputation of Foundation.*

*5.5 Chapter shall comply with all federal, state, county and local laws, regulations, rules and ordinances applicable to it or relating to nonprofit corporations and charitable organizations.*

***"Governance and Legal" Governing Policy***

*Chapters shall adhere to the highest legal and ethical standards, protecting the name, reputation, and intellectual property of the Foundation, ensuring sound nonprofit management and governance, and maintaining positive relationships within the Make-A-Wish network.*

***Performance Standards***

***GL 6.2 Applicable Laws****. Chapters shall comply with all applicable federal, state and local charity laws, ordinances, standards and regulations.*

***GL 6.3 Other Standards****. Chapters shall comply with the BBB Wise Giving Alliance's "Charity Standards" (http://www.give.org/standards/newcbbbstds.asp) and the Association of Fundraising Professionals' "Code of Ethical Principles and Standards of Professional Practice" (http://www.afpnet.org/ethics/guidelines_code _standards).*

***GL 2.5 Confidential Information****. Chapters shall maintain the confidentiality of donor, volunteer, personnel and wish family information, and shall not disclose*

> *any such information to anyone outside the Make-A-Wish Foundation without the prior written permission of the affected individual or entity, unless otherwise required by applicable state law or the National Office.*

The Chapter, represented by counsel, appealed that decision to MAWFA's Executive Committee (also comprised of volunteer members of MAWFA's board of directors), which unanimously affirmed the revocation decision following another hearing at which the Chapter presented its position.

As clearly provided for in the Chapter Agreement, "[t]he decision of the Executive Committee on the appeal shall be final and unappealable." Despite this unambiguous provision, the Chapter filed suit in Rhode Island Superior Court. The complaint alleges breach of contract and seeks an injunction against acts of dissolution. The Chapter alleges that MAWFA breached the Chapter Agreement by refusing to agree to arbitration -- even though that remedy is expressly not provided for in matters regarding chapter discipline.

Because the Chapter's complaint fails to state a claim for breach of contract, the Chapter cannot carry its burden to establish the requirements for a preliminary injunction -- including, most significantly, any likelihood of success on the merits. For this reason, the Temporary Stay should be lifted, and the motion for preliminary injunction denied.

Finally, this case concerns a significant amount of funds donated to serve Rhode Island children with life-threatening medical conditions. It is now, and always has been, MAWFA's intention and practice to ensure that all such funds are used to grant the wishes of children residing in Rhode Island, in accordance with the donors' intent.

## I. BACKGROUND

### A. The Make-A-Wish Foundation and its Local Chapters.

MAWFA, founded as a national organization in 1984, is a nonprofit corporation organized and existing under the laws of the State of Arizona. Declaration of David B. Mulvihill, Esq. ("Mulvihill Decl." ¶ 7). The mission of the Make-A-Wish Foundation is to grant the wishes of children with life-threatening medical conditions to enrich the human experience with hope, strength and joy. *Id.*, ¶ 2.

At the present time, there are 66 licensed Make-A-Wish chapters in the United States and its territories, each of which (like MAWFA) is a separately incorporated nonprofit corporation that qualifies for tax-exempt status under Section 501(c)(3) of the Internal Revenue Code. *Id.*, ¶ 8. Make-A-Wish chapters have collectively granted the wishes of more than 160,000 children with life-threatening medical conditions since MAWFA was founded. Approximately 880 of those wishes have been granted by the Rhode Island Chapter. *Id.*, ¶ 9 and **Ex. A**.

For a number of years, MAWFA has required Make-A-Wish employees, board members and other volunteers to sign a "Conflict of Interest and Ethics Assurance Statement" (Mulvihill Decl., **Ex. B**) at the time they become involved with the organization and at least annually thereafter. Mulvihill Decl. ¶ 10. To further ensure compliance with legal and ethical obligations and the delivery of quality services, MAWFA requires that each Make-A-Wish chapter sign a Chapter Agreement with MAWFA. *Id.*, ¶ 14. A true and correct copy of the Chapter Agreement between MAWFA and the Rhode Island Chapter is attached to the Mulvihill Decl. at **Ex. C**.

Pursuant to the Chapter Agreement, chapters are granted the right to use MAWFA's trademarks, service marks and trade names in a specific geographic area on the express condition that they "strictly comply with various obligations set forth in this Agreement, [MAWFA's] bylaws as the same may be amended from time to time …, and other policies, rules, resolutions and standards that are promulgated by [MAWFA], whether before or after the Effective Date (the 'Policies')." Mulvihill Decl. ¶ 16 and **Ex. B**, last recital.[1]

Among the fundamental "duties, warranties and obligations" of chapters set forth in Section 5 of the Chapter Agreement (**Ex. C**) are the following:

---

[1] MAWFA is the exclusive owner of various federally registered and common law trademarks, service marks and trade names including MAKE-A-WISH and MAKE-A-WISH FOUNDATION, as well its swirl-and-star logo (collectively referred to as the "Marks"). These Marks have become increasingly well known and highly regarded throughout the world. In many respects, the Marks constitute MAWFA's most valuable, indeed priceless, asset because it is the goodwill associated with the Marks that enables the entire nationwide organization to continue to attract the volunteers, financial resources and other in-kind support needed to carry out its charitable mission. Mulvihill Decl. ¶¶ 9, 11, 12.

> *5.3 Chapter agrees to comply with, and be bound by, the terms of [MAWFA's] Bylaws, this Agreement and the Policies [defined to include MAWFA's Governing Policies and Performance Standards[2]].*
>
> *5.4 Chapter shall use its best efforts in performing the Foundation's Purpose, in cooperating with [MAWFA] and Other Chapters, and in protecting the Marks and the integrity and good reputation of [MAWFA].*
>
> *5.5 Chapter shall comply with all federal, state, county and local laws, regulations, rules and ordinances applicable to it or relating to nonprofit corporations and charitable organizations.*

**B. Chapter Discipline and Revocation.**

Under MAWFA's corporate documents, the authority to impose discipline on chapters rests with the Chapter Performance Committee ("CPC"). The CPC is comprised of four MAWFA board members (most of whom previously served as a member and/or chair of a Make-A-Wish chapter's board of directors) and three chapter representatives from across the country (all of whom are current or former chapter board members or employees volunteering their time to serve on the CPC). Mulvihill Decl. ¶ 20.

Chapter discipline may only be imposed by the CPC at a duly noticed "Chapter Action Meeting," and a chapter has the right to submit a written statement and participate in the Chapter Action Meeting. Chapter Agreement § 15. If the CPC determines that a chapter is "in breach of its obligations under this Agreement, [MAWFA's] Bylaws or the Policies" the CPC "shall have the power to place Chapter on 'Probation' as described in Section 12, 'Inactive Status' as described in Section 13 or impose Revocation as described in Section 14." *Id.*, § 11.

Upon revocation, a chapter must, *inter alia*: (a) cease to use the Marks or claim to be associated with MAWFA in any way; (b) turn over the chapter's books and records; (c) provide an accounting of all funds received and disbursed by the chapter; (d) transfer all chapter assets to MAWFA (such funds have always been used to grant wishes in the former chapter's territory);

[2] Pertinent sections of MAWFA's Governing Policies, Performance Standards and Guidelines are attached to the Mulvihill Decl. at **Ex. D**.

and (e) take any other actions deemed reasonably necessary to disassociate the chapter and MAWFA. *Id.*, § 14; *see also* Mulvihill Decl. ¶ 23.

A chapter may appeal a decision of the CPC to the Executive Committee of MAWFA's board of directors. Chapter Agreement § 17. Under Section 17.3, "The decision of the Executive Committee on the appeal shall be final and unappealable." (Emphasis added.) Section 21.2 expressly states, "All disputes between [MAWFA] and Chapter regarding chapter discipline shall be governed exclusively by and within the rules established in this Agreement, [MAWFA's] Bylaws and the Policies." (Emphasis added.) *See also id.*, § 21.3 ("In no event shall Chapter institute any action or proceeding against [MAWFA] in any court, whether local, state or federal."); Mulvihill Decl. ¶ 26.

### C. Violations Committed by the Rhode Island Chapter and Revocation of its Charter.

In late February 2008, MAWFA learned that the IRS Form 990s filed by the Rhode Island Chapter for fiscal years 2005 and 2006 failed to disclose the compensation of the Chapter's President & CEO as an officer and/or key employee.[3] Mulvihill Decl. ¶¶ 27, 28. Pertinent portions of the IRS Forms 990s in question -- which were prepared by Frank Melucci (a CPA who serves as the Chapter's Treasurer) and signed by Dr. Diana Hackney (the Chapter's President & CEO) "under penalties of perjury" -- are attached to Mulvihill Decl. as **Exhibits E** and **F**. MAWFA also learned that the Chapter had voluntarily disclosed confidential information regarding wish children on a schedule attached to that form.[4] Mulvihill Decl. ¶ 37.

By letter dated February 28, 2008 (Mulvihill Decl., **Ex. G**), MAWFA notified the Chapter that the CPC would consider imposing discipline "up to and including revocation of

[3] The Internal Revenue Service requires charities and other nonprofit corporations annually to disclose basic financial information in the IRS Form 990, including information about compensation paid to officers, directors and key employees, and such annual statements are public records that must be made available for public inspection. *See* I.R.C. § 6033; § 6104.

[4] In accordance with the Court's rules on electronic filing, MAWFA has redacted the full names of these minor children and other identifying information from the pertinent exhibits. As filed by the Chapter with the IRS, the forms contained no redactions. Mulvihill Decl. ¶ 28.

[Chapter's] affiliation with the Make-A-Wish Foundation" during a Chapter Action Meeting on March 12, 2008. Mulvihill Decl. ¶ 33.

The Chapter submitted a written statement, which was distributed to members of the CPC (Mulvihill Decl., **Ex. H**), and presented its case at the March 12, 2008 Chapter Action Meeting. Mulvihill Decl. ¶ 34. In its written submission and oral presentation at the Chapter Action Meeting, representatives of the Chapter admitted the failure to disclose the compensation of the Chapter's President & CEO as an officer and/or key employee in the Chapter's IRS Form 990s was intentional, not inadvertent. The Chapter further admitted that the intentional failure to disclose this required information was for the purpose of not having the public, including donors and potential donors, learn of the CEO's compensation. Mulvihill Decl. ¶ 35, **Ex. H** (the Chapter's written statement to the CPC), at 3. With regard to disclosure of confidential information, the Chapter also admitted that confidential information about wish children was listed on an attachment to the Chapter's Form 990s. *Id.*

After considering the Chapter's position and presentation at the Chapter Action Meeting, members of the CPC voted unanimously to revoke the Chapter's status as a Make-A-Wish chapter, and to place the Chapter on Probation pending the outcome of the appeal, based on its violations of Sections 5.3, 5.4 and 5.5 of the Chapter Agreement; MAWFA's "Governance and Legal" Governing Policy; and Performance Standards GL 2.5 ("Confidential Information"), GL 6.2 ("Applicable Laws") and GL 6.3 ("Other Standards"). Mulvihill Decl. ¶¶ 36, 37. MAWFA notified the Chapter of the CPC's decision by letter dated March 14, 2008. *Id.*, **Ex. I**.

Pursuant to Section 17 of the Chapter Agreement, the Chapter filed a timely notice of appeal to MAWFA's Executive Committee on April 16, 2008. Mulvihill Decl., **Ex. J**. An Executive Committee hearing on the appeal was thereafter scheduled for May 15, 2008. Mulvihill Decl. ¶ 39.

On May 9, 2008 -- the Friday before the Executive Committee hearing -- the Chapter submitted a Memorandum and three affidavits in support of its appeal, along with more than 1,100 pages of material consisting of 38 "potential exhibits" and 188 "Liability Release and

Authorization Re: Medical Information and Publicity" forms. *Id.*, ¶ 40. These materials were forwarded to the Executive Committee either that day or by Monday, May 12, 2008. *Id.*, ¶ 41. On Tuesday, May 13, 2008, after reviewing the material submitted by the Chapter, MAWFA's Director of Chapter Support and Senior Manager of Mission Resources signed sworn declarations addressing various points raised in the Chapter's Memorandum, which were forwarded to the Executive Committee members and the Chapter's attorneys that day. The Chapter responded to the declarations the following day, and its response was promptly forwarded to the members of the Executive Committee. *Id.*, ¶ 42.

In accordance with Section 17 of the Chapter Agreement, the Executive Committee conducted a hearing on Thursday, May 15, 2008, during which representatives of the Chapter (including its counsel) and the CPC presented evidence and made arguments in support of their respective positions. Once again, the Chapter admitted that, notwithstanding Dr. Hackney's sworn declaration, it made a deliberate and conscious decision not to include in its Form 990s the CEO compensation information required by the IRS. *Id.*, ¶ 44. Following the hearing, and after careful deliberations, members of the Executive Committee voted unanimously to uphold the CPC's decision to revoke the Chapter's status as a Make-A-Wish chapter. *Id.*

MAWFA's general counsel, David Mulvihill, informed counsel for the Rhode Island Chapter of the Executive Committee's decision on Friday, May 16, 2008. At that time, Mr. Mulvihill also explained that two MAWFA representatives would be visiting the Chapter offices on Tuesday May 20, 2008, to begin the process of working together to ensure an orderly transition. *Id.*, ¶ 45.

**D. The Rhode Island Chapter Initiates this Lawsuit and Obtains a Stay.**

On May 19, 2008, the Chapter initiated this action in Providence County Superior Court and sent copies of the complaint to MAWFA by facsimile and by e-mail.[5] The complaint asserts

[5] MAWFA did not receive any summons, nor did it receive a written notice and request for waiver of service of process. *See* R.I. R. Civ. P. 4.

one count -- for breach of contract -- claiming that MAWFA failed to "agree to follow the dictates of the AAA arbitration clause" enumerated in the Chapter Agreement. Complaint ¶ 12.

Prior to that time, in an e-mail sent the morning of the Executive Committee hearing, counsel for the Chapter had asked Mr. Mulvihill, "[i]f the revocation is approved or confirmed, would the Committee be willing to allow a stay until AAA arbitration is filed?" Mr. Mulvihill responded that chapter discipline "is not a matter that is subject to arbitration and/or further appeal," citing Chapter Agreement, Section 17.3 ("The decision of the Executive Committee on the appeal shall be final and unappealable") and Section 21.2 ("All disputes between Foundation and Chapter regarding chapter discipline shall be governed exclusively by and within the rules established in this Agreement, Foundation's Bylaws and the Policies"). Mulvihill Decl. ¶ 43. (A copy of counsel for the Chapter's May 15, 2008 e-mail and Mr. Mulvihill's response are attached at Mulvihill Decl., **Ex. M**.)

On May 19, 2008, the Chapter also filed a Motion for a Temporary Restraining Order and Preliminary Injunction. On May 20, 2008, the Superior Court issued, *ex parte*, an Order, a true and correct copy of which is attached hereto at Tab 1, directing that defendant "refrain from taking any measures to revoke, consolidate, merge or assume ultimate control over the Rhode Island Chapter." As stated in the Order, it is based on representations to the Court that Mr. Mulvihill consented to the entry of a temporary restraining order. In fact, at no time did Mr. Mulvihill consent to the entry of a temporary stay. Rather, in a telephone conversation with the Chapter's attorneys on May 19, 2008, Mr. Mulvihill explained he would instruct the MAWFA employee scheduled to visit the Chapter offices the following day to cancel her visit and return to Phoenix immediately because he did not want her subjected to the kind of hostile environment that counsel threatened she would encounter. Mulvihill Decl. ¶ 45.

## II. ARGUMENT

### A. Standard of Review.

"[T]he granting of interlocutory injunctive relief is a drastic procedure." *Int'l Ass'n of Machinists and Aerospace Workers v. Eastern Air Lines, Inc.*, 826 F.2d 1141, 1144 (1st Cir.

1987). Plaintiff must satisfy each of the four well established and demanding criteria to obtain the extraordinary relief its seeks: (1) that without an injunction it will suffer irreparable injury; (2) that it is likely to prevail on the merits; (3) that the balance of hardships tips in its favor; and (4) that the injunction will not adversely affect the public interest. *E.g.*, *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 8-9 (1st Cir. 2002); *Planned Parenthood League v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir. 1981). Plaintiff cannot meet its burden on *any* of the four criteria. *Auburn News Co. v. Providence Journal Co.*, 659 F.2d 273, 277 (1st Cir. 1981).

**B. Plaintiff Will Not Succeed on the Merits Because its Claim Fails as a Matter of Law.**

"The *sine qua non* of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc.*, 287 F.3d at 9. Plaintiff simply states no claim suitable for relief because there is no breach of contract.

**1. The Chapter Agreement Does Not Allow for Arbitration of Issues of Chapter Discipline.**

Applying basic principles of contract interpretation, the Chapter Agreement, in plain and unambiguous terms, sets forth a comprehensive and final process for matters of chapter discipline. This internal process involves, first, an initial disciplinary determination by the CPC, and, second, if the Chapter so chooses, an appeal to the Executive Committee. There can be no dispute that this process was followed here. Importantly, and fatal to the Chapter's claim for breach of contract, the Chapter Agreement is explicit that "[t]he decision of the Executive Committee on the appeal shall be final and unappealable." Chapter Agreement, § 17.3 (emphasis added). That provision could not be stated in any plainer or clearer terms.[6]

[6] Section 20 of the Chapter Agreement provides that "[t]his Agreement shall be governed by, and shall be construed and interpreted in accordance with, the internal laws of the State of Arizona without the application of any principles of conflicts of laws that would require or permit the application of the laws of any other jurisdiction."

Under both Arizona and Rhode Island law, when the terms of a contract are clear and unambiguous, they must be enforced. *See, e.g., Horton v. Mitchell*, 200 Ariz. 523, 527, 29 P.3d 870, 874 (Ariz. Ct. App. 2001), *quoting Chandler Med. Bldg. Partners v. Chandler Dental Group*, 175 Ariz. 273, 277, 855 P.2d 787, 791 (Ariz. Ct. App. 1993) ("The controlling rule of contract interpretation requires that the ordinary meaning of language be given to words where circumstances do not show a different meaning is applicable."); *accord W.P. Assocs. v. Forcier, Inc.*, 637 A.2d 353, 356 (R.I. 1994), *citing Aetna Cas. & Surety Co. v. Graziano,* 587 A.2d 916, 917 (R.I. 1991) ("If the court finds that the terms of an agreement are clear and unambiguous, the task of judicial construction is at an end and the agreement must be applied as written.").

Further, Section 21.2 of the Chapter Agreement expressly states that: "All disputes between [MAWFA] and Chapter regarding chapter discipline shall be governed exclusively by and within the rules established in this Agreement, [MAWFA's] Bylaws and the Policies." *Id.* at § 21.2 (emphasis added). The Chapter Agreement is quite explicit that the Chapter has no rights to seek further review of the Executive Committee decision regarding chapter discipline -- although MAWFA may, in the event it is needed, initiate a court action to enforce such discipline.[7] *See id.* ("Following resolution of a chapter discipline dispute in accordance with this Agreement, [MAWFA's] Bylaws and the Policies, [MAWFA] may, in circumstances requiring Extraordinary Relief (as defined below), enforce such result by bringing an action in [Arizona state or federal court]") (emphasis added) and § 21.3 ("In no event shall Chapter institute any action or proceeding against [MAWFA] in any court, whether local, state or federal").

---

[7] Section 21.3 also provides that "Chapter and [MAWFA] agree that exclusive jurisdiction for any dispute involving Extraordinary Relief shall be the state court for the state in which the headquarters of [MAWFA] is then located, or in the United States District Court for the state in which the headquarters of [MAWFA] is located." Under this forum selection clause, any action permitted to be brought in court (and this is not such an action), must be brought in Arizona. Accordingly, by bringing this action in Rhode Island court, the Chapter has once again breached the Chapter Agreement.

Simply put, the Chapter's claim that the Chapter Agreement allows for arbitration of decisions of the Executive Committee, if true, would render meaningless the clear provision that a decision of the Executive Committee on appeal is "final and unappealable." It is a basic principle of contract law that "the court will not construe one provision in a contract so as to render another provision meaningless." *Chandler Medical Bldg. Partners*, 175 Ariz. at 277, 855 P.2d at 791 (Ariz. Ct. App. 1993), *citing Norman v. Recreation Centers of Sun City, Inc.*, 156 Ariz. 425, 428, 752 P.2d 514, 517 (Ariz. Ct. App. 1988). *Accord Anglo American Ins. Co., Ltd. v. Shooters at India Point, Inc.*, 959 F. Supp. 115, 117 (D.R.I. 1997), *quoting Psaty & Fuhrman. Inc. v. Housing Auth. of Providence*, 76 R.I. 87, 68 A.2d 32, 35 (1949) ("construction [of a contractual provision] cannot render meaningless [another] express condition of the contract").

Accordingly, the complaint fails to state a claim for breach of contract. Indeed, by bringing this action, it is the Chapter that is in further breach of the Chapter Agreement.

**2. Internal Matters of Chapter Discipline Are Generally Not Subject to Outside Review.**

MAWFA's exclusive and final provisions regarding chapter discipline are fully consistent with treatment of matters of internal governance of voluntary associations, which generally are not subject to outside review by courts -- or, for that matter, by arbitrators. Just last year, the Rhode Island Supreme Court reiterated this principle: "It is well settled that, ordinarily, the courts will not interfere with the internal workings of a voluntary organization as long as such rules are reasonable and consistent with public policy." *King v. Grand Chapter of R.I. Order of Eastern Star*, 919 A.2d 991, 996 (R.I. 2007) (collecting cases within and outside of Rhode Island); *see also Gorman v. St. Raphael Academy*, 853 A.2d 28, 37 (R.I. 2004) ("there should be no judicial interference with the internal affairs, rules and by-laws of a voluntary association unless their enforcement would be arbitrary, capricious or constitute an abuse of discretion") (internal quotation and citation omitted); *Rowland v. Union Hills Country Club*, 157 Ariz. 301, 305, 757 P.2d 105, 109 (Ariz. Ct. App. 1988) (courts will not become involved in the internal disputes of a social organization resulting in the suspension or expulsion of its members

unless "it is established that the action taken violated the organization's by-laws or was in bad faith, fundamentally unfair, fraudulent or utterly unsupported by any evidence").

Although *King* concerned the discipline of members of an organization, and here the issue is the revocation of a chapter's charter, a "common thread" is "the unwillingness of courts to inject themselves into the internal affairs of private organizations where the rules of those organizations are reasonable and do not violate public policy." 919 A.2d at 997. This is so because organizations "must have considerable latitude to formulate and enforce their own rules to accomplish their [charitable] objectives." *Gorman*, 853 A.2d at 39. Thus, consistent with their "'contractual' nature," "rules and regulations generally are binding on those who wish to remain [chapters], provided however, that said rules do not conflict with public policy." *Id.* at 38-39 ("[A] contract term is unenforceable only if it violates public policy"); *see also* 6 Am. Jr. 2d Associations § 21 ("By becoming a member of a voluntary association, one agrees to be bound by its valid rules, subjects himself or herself to its discipline, and assumes, of necessity, such obligations as are incident to membership…").

As a result, organizations like MAWFA "may, without direction and interference by the courts, for its government, adopt a constitution, by-laws, rules and regulations which will control as to all questions of discipline, or internal policy and management, and its right to interpret and administer the same is as sacred as the right to make them."[8] *Gorman*, 853 A.2d at 38, *quoting Edwards v. Indiana State Teachers Assoc.*, 749 N.E.2d 1220, 1225 (Ind. Ct. App. 2001) (emphasis added). *See also Blubaugh v. American Contract Bridge League*, 2004 WL 392930 *6 (S.D. Ind. Feb. 18), *aff'd* 2004 WL 2676592 (7th Cir. 2004) (dismissing breach of contract claim under general rule that "courts will not interfere in the governance of such a private organization, such as its interpretation and administration of rules governing membership and

[8] This approach is akin to the application of the "business judgment rule," under which courts, absent circumstances not present here, decline to interfere with decisions regarding a corporation's internal affairs and governance or its corporate management. *See, e.g., King*, 919 A.2d at 998; *Chisholm*, 115 Md. App. at 70-71, 691 A.2d at 781-82.

discipline"); *Chislom v. Hyattstown Volunteer Fire Dept., Inc.*, 115 Md. App. 58, 70, 691 A.2d 776, 782 (Md. Ct. Spec. App. 1997) ("courts will not interfere in the internal affairs of a voluntary membership organization"); 6 Am. Jr. 2d Associations § 31 ("The decisions of the tribunals of an association with respect to its internal affairs will, in the absence of mistake, fraud, illegality, collusion, or arbitrariness, be accepted by the courts as conclusive").

**3. The Chapter Agreement Provided Ample Process and the CPC -- and the Executive Committee -- Had More Than Adequate Reason to Revoke the Charter.**

As noted already, the Chapter Agreement, which was approved by a super majority of Make-A-Wish chapters (Mulvihill Decl. ¶ 15), provides for the imposition of discipline by the impartial CPC and an appeal to the impartial Executive Committee. The Chapter was given appropriate notice and was provided with the opportunity to present its position twice -- at two separate hearings before two separate committees. The decision to revoke the Chapter's status as a Make-A-Wish chapter was made by the CPC following a hearing on March 12, 2008. The Chapter appealed the CPC's decision to the Executive Committee, as allowed under the Chapter Agreement. The Executive Committee conducted a teleconference hearing on May 15, 2008, during which the Chapter was permitted to introduce such evidence and advance such arguments as it deemed appropriate. After considering the Chapter's evidence and arguments, members of the Executive Committee voted unanimously to uphold the CPC's revocation decision. Thus, the Chapter was provided with ample process in accordance with the Chapter Agreement.

Not only was ample process provided, but the CPC, the Executive Committee and MAWFA had ample reason for revoking the Chapter's charter for violations of the Chapter Agreement, MAWFA's bylaws and the Policies.

<u>First</u>, for two years the Chapter submitted inaccurate and incomplete IRS Form 990s, failing to list its President & CEO's compensation and, in some instances, affirmatively misrepresenting the total compensation of all Chapter officers and key employees as "$0" or "None." The Chapter's Form 990s were untrue, incorrect and incomplete in at least the following respects:

> Part II, line 25: Asked to disclose the "Compensation of officers, directors, etc.," the Chapter left the line blank for FY 2005 and expressly stated "$0" for FY 2006;
>
> Part V: Asked for information about "Current Officers, Directors, Trustees and Key Employees" during the year ("even if they were not compensated"), the Chapter referred to an attached "Statement 6" but expressly stated "$0" under the heading "Compensation";
>
> Statement 6: Although entitled "List of Officers, Directors, Trustees and Key Employees," the Chapter's attached Statement 6 did not include Dr. Hackney, who as President & CEO was clearly an "Officer" and/or a "Key Employee"; and
>
> Schedule A: Asked to list the "Compensation of the Five Highest Paid Employees Other Than Officers, Directors and Trustees," the RI Chapter expressly stated "None," thereby misrepresenting that there were no "employees paid more than $50,000."

Mulvihill Decl. ¶ 29, **Exs. E and F** (Chapter Form 990s). The Chapter admitted that these omissions were intentional so that the public, including donors and potential donors, would not learn of the CEO's compensation. *Id.*, ¶ 35 and **Ex. H** (Chapter Statement to CPC), at 3.

The intentional failure to disclose the compensation of an officer or key employee is directly contrary to IRS rules, regulations and published guidance.[9] *See, e.g.*, I.R.C. § 6033 and 26 C.F.R. § 1.6033 *et. seq*.; I.R.C. § 6104. As explained in the IRS's "Reporting Compensation on Form 990," "[c]ompensation of an exempt organization's executives is some of the information most sought by the public on Form 990. … When a return that fails to report compensation fully and accurately is submitted, the Service's ability to perform its duties, the public's right to obtain meaningful information, and the public's ability to police abuses are all impaired, since Form 990 is the main public source of such information."[10] 1996 EO CPE Text at 1 (copy attached at Tab 2).

---

[9] The IRS produces articles on various issues affecting exempt organizations which are published annually as part of its Exempt Organizations Continuing Professional Education Technical Instruction Program ("EO CPE Text") (available on line at irs.gov).

[10] An organization is required to make its Form 990s available for public inspection, and may be subject to a penalty of up to $10,000 if its does not. *See* 2003 EO CPE Text "Form 990, Schedule A and Schedule B", at H-11 (copy attached at Tab 3).

Thus, the IRS requires that an organization report the compensation of its "officers" on the Form 990 and, to ensure reporting of the compensation of top executives, also requires reporting for "key employees," defined as those with the powers or responsibilities of officers, directors or trustees. *Id.* at 4.F. An organization also must report its top five other employees earning more than $50,000 in total compensation. *Id.* at 3, *citing* 26 C.F.R. 1.6033-2(a)(2)(ii)(a).

This is a serious obligation. The IRS has stated that the incomplete reporting of compensation is "a situation that happens too often to appear as an honest mistake." *Id.* at 5.E (emphasis added). Thus, the IRS views such oversights with "skepticism, particularly if they happen recurrently with respect to a given [exempt organization]," explaining that "[a]n organization [and the preparer] that files a Form 990 with such important information missing may be subject to penalties." *Id.* Here, the Chapter has admitted that its failure to report the compensation of its President & CEO was intentional, not the result of an "honest mistake."

Further, the IRS has, as it must, acknowledged that Congress has "made most exempt organizations public." Through I.R.C. § 6104, Congress "weighs public good against private detriment on this question [of public disclosure of salary information] and makes the call in favor of public good." *See* 2003 EO CPE Text at H-9. As such, penalties for failure to report complete compensation information on Form 990 include financial penalties pursuant to I.R.C. § 6652 of up to $100 per day, not to exceed $50,000, and removal from IRS Publication 78, which lists those organizations that are eligible to receive tax deductible contributions, potentially impacting the organizations ability to attract donors. *See id.* at H-7, *discussing* I.R.C. § 6652. The IRS also requires that the Form 990 be signed "under penalties of perjury" by an officer and any preparer -- with the signatory declaring under oath "that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief it is true, correct, and complete. Declarations of preparer (other than officer) is based on all information of which preparer has any knowledge."

Because the IRS Form 990 serves as the primary document providing information about a charity's finances, governance, operations and programs for federal regulators, state charity

officials, charity watchdog agencies and the public at large, MAWFA takes matters of reporting failures extremely seriously, particularly where, as here, those failures were intentional. The Chapter suggests, in its motion for a preliminary injunction (p. 2), that because the IRS has not "raised an issue with the way the forms are filled out," this somehow excuses its failure to report the required information about compensation paid to its President & CEO. That is not true.

At this point, having not conducted an audit at the Chapter recently, the IRS has no way of knowing that the Form 990s filed by the Chapter under penalties of perjury were, in fact, not "true, correct and complete." The IRS has explained in its guidance that when an organization makes excuses for filing an inaccurate Form 990, it views such excuses with "skepticism." Under circumstances like these -- i.e., when an organization admits it made a conscious decision to intentionally file a Form 990 that it knew was inaccurate and incomplete, notwithstanding a sworn declaration to the contrary -- it is safe to assume the IRS would be even less likely to be understanding or forgiving. In any event, the absence of IRS action does not affect MAWFA's right to impose discipline on a chapter that violates the Chapter Agreement, MAWFA's bylaws and/or the Policies.

Second, the Chapter admitted that for a number of years it disclosed confidential information about wish children by appending this information -- including the wish children's first and last names and the cost of their wishes -- to its Form 990s. Such information is not required by the IRS and, therefore, this is a violation of Performance Standard GL 2.5, which provides:

> Chapters shall maintain the confidentiality of donor, volunteer, personnel and wish family information, and shall not disclose any such information to anyone outside the Make-A-Wish Foundation without the prior written permission of the affected individual or entity, unless otherwise required by applicable state law or the National Office.

As noted, Form 990s are readily available to the public. Thus, the names of these Rhode Island children served by the Chapter were revealed to the public, in clear violation of MAWFA's confidentiality requirements.

**4. No Rhode Island Law Prevents Revocation.**

In its complaint, the Chapter suggests that MAWFA cannot revoke the Chapter's charter without a court order. Complaint ¶¶ 8, 13. This is simply not so. The provisions cited -- R.I.G.L. § 18-9-1 *et seq.* -- pertain to charitable trusts. The Chapter is not a charitable trust. There is no suggestion that the Chapter was the product of a bequest for a specific charitable purpose to be held and administered by a trustee. *See* R.I.G.L. § 18-9-4 (defining charitable trust as "any fiduciary relationship with respect to property arising as a result of a manifestation of an intention to create it and subjecting the person by whom the property is held to equitable duties to deal with the property for charitable, educational, or religious purposes"), and R.I.G.L. § 18-9-15 (exempting "charitable, religious, and educational institutions holding funds in trust exclusively for their own charter or corporate purposes"). Even if the Chapter were a charitable trust, the provision requiring a court order before dissolution has no bearing on whether MAWFA can revoke the Chapter's charter, but rather concerns the procedure for the ultimate transfer of assets. MAWFA fully intends to comply with any state law regarding asset transfers.

In any event, the Chapter does not identify itself as a charitable trust, but rather as a nonprofit corporation. For example, on its Form 990s, line J, the Chapter self-identifies as a Section 501(c)(3), not a Section 4947(a)(1) charitable trust. In its filings with the Rhode Island Secretary of State (available online at http://ucc.state.ri.us/CorpSearch/CorpSearchInput.asp), the Chapter similarly self-identifies as a domestic nonprofit corporation. Rhode Island has a specific statutory scheme governing non-profit corporations, the Nonprofit Corporation Act, R.I.G.L. § 7-6-1 *et seq.*, which contains provisions allowing the disposition of assets at dissolution.

**C. The Balance of Equities Favors MAWFA, not the Chapter.**

The Chapter claims that the balance of equities tips in its favor because "due process requires that there is an impartial evidentiary hearing." Motion for Preliminary Injunction at 2. The Chapter, however, has received all of the due process to which it is entitled, including impartial evidentiary hearings before the CPC and the Executive Committee, both of which are

comprised of Make-A-Wish volunteers from across the country. Nothing in the Chapter Agreement (or elsewhere) supports the Chapter's assertion that it is entitled to further process.

In contrast, MAWFA stands to suffer significant harm as a result of the Chapter's actions. MAWFA has a fiduciary responsibility to look out for the interests of the entire nationwide Make-A-Wish organization. In order to ensure the Make-A-Wish Foundation continues to earn the trust of the American public, upon whose generosity MAWFA and chapters depend to carry out their charitable mission, MAWFA has the right, if not the duty, to require that its chapters adhere to strict standards regarding sound nonprofit governance -- and to impose discipline, up to and including revocation, when a chapter fails to do so. Further, as owner of the Make-A-Wish Marks, MAWFA is obligated to protect those Marks from unauthorized use, including use by a chapter whose charter has been revoked in accordance with the Chapter Agreement.

As the result of the hard work of Make-A-Wish volunteers and employees over the past 20-plus years, people have come to trust that if they donate their hard-earned money to the Make-A-Wish Foundation, such funds will be put to good use by an organization that values accountability and transparency and adheres to strong ethical principles. The improper actions of one chapter can have a very real possibility of adversely impacting the Make-A-Wish Foundation's good name and reputation, thereby potentially jeopardizing the organization's ability to grant the wishes of deserving children across the country. In short, MAWFA and chapters alike will be harmed if MAWFA is unable to effectively address issues of chapter discipline within its own organization, as it has done in the case of the Rhode Island Chapter.

Finally, a delay in resolving this revocation, such as the injunction requested by the Rhode Island Chapter in its motion, will necessarily hamper MAWFA's efforts to ensure that the Make-A-Wish Foundation's charitable mission is fulfilled throughout the United States.

**D. Public Interest Counsels Against Granting a Preliminary Injunction.**

The paramount public interest involved in this dispute is the interest in providing charitable services to children with life-threatening medical conditions. MAWFA believes that the public interest will best be served by ensuring that the wishes of children in Rhode Island are

granted by an organization that abides by principles of transparency, accountability and sound governance and that understands the importance to the organization as a whole of complying with its obligations under the Chapter Agreement and the Policies.

As explained above, Congress has determined that the public interest is best served by organizations that comply with the disclosure requirements on the IRS Form 990. Certainly, there can be little doubt that the public interest is also served by protecting minor children from disclosure of confidential information. For all of theses reasons, MAWFA strongly believes that the public interest in this case supports allowing it to discipline its chapters in accordance with the fair and reasonable procedures set forth in the Chapter Agreement.

**E. Plaintiff Will Suffer No Irreparable Harm.**

"A federal court must find a cognizable threat of irreparable harm as an essential prerequisite to the issuance of a preliminary injunction." *Ralph v. Lucent Tech., Inc.*, 135 F.3d 166, 170 (1st Cir. 1998). Here, the Chapter suggests, without any accompanying affidavit, that it will suffer "irreparable harm" because (1) MAWFA intended to "commence winding down and dissolution proceedings" immediately on May 20, 2008 and (2) the "funds raised for the children of Rhode Island, by the benefactors living in Rhode Island, will not necessarily be used for its intended purpose." *See* Motion for Preliminary Injunction at 1-2. Neither claim is accurate.

Two MAWFA representatives were scheduled to visit the Chapter offices on Tuesday, May 20, 2008, in order to gather information and begin the process of planning an orderly transition that would ensure that wish granting in Rhode Island continued in as seamless a manner as possible. Muvihill Decl. ¶ 45. There was no plan for the MAWFA representatives to dispossess the Chapter from its offices, to immediately seize assets, or to take any other precipitous action during their visit. *Id.*

To the contrary, MAWFA's intent was always to work cooperatively with Chapter representatives on an orderly transition that would be in the best interest of the Make-A-Wish Foundation and the children it serves, while at the same time fully complying with the requirements of Rhode Island law. *Id.* Indeed, in those instances where a chapter's affiliation

with MAWFA has been revoked (voluntarily or involuntarily) in the past, it has always been MAWFA's practice to use the funds raised in the former chapter's territory to grant the wishes of children residing in that territory. Muvihill Decl. ¶ 48.

In any event, the Chapter cannot suffer irreparable injury absent an injunction for the simple reason that the decision of the Executive Committee, affirming the CPC's decision to revoke the Chapter's charter, is "final and unappealable." There is simply no injury.

## III. CONCLUSION

For the foregoing reasons, defendant Make-A-Wish Foundation of America moves that the temporary stay issued on May 20, 2008 by the Providence Superior Court be lifted and that plaintiff's motion for a preliminary injunction be denied.

Respectfully submitted,

**MAKE-A-WISH FOUNDATION OF AMERICA,**

By its attorneys,

/s/*Carol E. Head*

Carol E. Head (#6501)
carol.head@bingham.com
Robert E. McDonnell*
robert.mcdonnell@bingham.com
**BINGHAM MCCUTCHEN LLP**
1 Federal Street
Boston, MA 02110
617.951.8000
**admitted pro hac vice*

*Of Counsel:*
David B. Mulvihill, Esq.
Vice President & General Counsel
Make-A-Wish Foundation of America
3550 North Central Avenue, Suite 300
Phoenix, AZ 85012-2127
Phone: 602.279.9474

Dated: May 30, 2008

**CERTIFICATE OF SERVICE**

I hereby certify that this document has been filed electronically and is available for viewing and downloading from the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, paper copies will be sent to those indicated as non-registered participants, and a courtesy copy will be sent via mail to the Rhode Island Attorney General's Office, on May 30, 2008.

/s/*Carol E. Head*

Carol E. Head (#6501)
**BINGHAM MCCUTCHEN LLP**
One Federal Street
Boston, MA 02110
617.951.8000