UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| MAKE-A-WISH FOUNDATION OF RHODE ISLAND, INC.,<br><br>Plaintiff,<br><br>v.<br><br>MAKE-A-WISH FOUNDATION OF AMERICA,<br><br>Defendant. | CIVIL ACTION NO. 1:08-cv-206-S |

# DECLARATION OF DAVID B. MULVIHILL

I, David B. Mulvihill, declare under penalty of perjury that the following statements are true and correct to the best of my knowledge, information and belief:

## Introduction

1. I am a member in good standing of the bar of the court of the Commonwealth of Pennsylvania, where I have been duly licensed to practice law since 1981.

2. For the past nine years, I have been employed as Vice President & General Counsel of the Make-A-Wish Foundation of America (hereinafter "MAWFA"), a nonprofit corporation organized and existing under the laws of

the State of Arizona. Our charitable mission is to grant the wishes of children with life-threatening medical conditions to enrich the human experience with hope, strength and joy.

3. As MAWFA's Vice President & General Counsel, I am the individual primarily responsible for handling or overseeing all of the organization's legal affairs. I either have personal knowledge of the facts set forth herein, or I reasonably believe them to be true based on historical documents I have reviewed and/or historical accounts I have received in the course of my employment with MAWFA.

4. Prior to joining the staff of MAWFA in 1999, I had been a Make-A-Wish volunteer for more than 12 years. Among the volunteer capacities in which I served were as a member and/or chair of the board of directors of a Make-A-Wish chapter in Pennsylvania and, thereafter, as a member of MAWFA's board of directors.

**Background re: MAWFA**

5. In April 1980, a group of individuals joined together to grant the wish of a very sick, 7-year old boy from Phoenix, Arizona, who dreamed of becoming a policeman. At the end of his adventure, the boy exclaimed, "This has been the best day of my life!" He passed away shortly thereafter.

6. With the fulfillment of that first wish, the Make-A-Wish Foundation was born. Although the founders initially intended to serve only sick children in the Phoenix area, public interest grew and the news media began to publicize the efforts of the fledgling organization. As a result, people throughout the United States and from countries around the world began to inquire about the possibility of forming Make-A-Wish chapters in their area.

7. In 1984, MAWFA was founded as a national organization to oversee the development of, and to provide financial and other support to, the individual chapters that had begun to arise.

8. At the present time, there are 66 licensed Make-A-Wish chapters in the United States and its territories, each of which (like MAWFA) is a separately incorporated nonprofit corporation that qualifies for tax-exempt status under Section 501(c)(3) of the Internal Revenue Code.

9. As a result of the conscientious efforts of a relatively modest number of employees and literally thousands of dedicated volunteers over the years, the Make-A-Wish Foundation has become the largest and most successful wish-granting organization in the world. As the chart attached as **Exhibit A** depicts, Make-A-Wish chapters have collectively granted the wishes of more than 160,000 children with life-threatening medical

conditions since MAWFA was founded. Approximately 880 of those wishes have been granted by our chapter in Rhode Island.

10. Recognizing that public trust and confidence in the Make-A-Wish Foundation is the *sine qua non* of our success to date and our continued success in the future, we have for many years required that Make-A-Wish employees, board members and other volunteers sign a "Conflict of Interest and Ethics Assurance Statement" (a copy of which is attached as **Exhibit B**) at the time they initially become involved with the organization, and at least annually thereafter. By doing so, such individuals acknowledge their personal obligation to maintain the highest standards of ethical conduct and agree, among other things, not to commit acts contrary to those standards or to condone the commission of such acts by others within the Foundation.

## The Make-A-Wish "Marks"

11. MAWFA is the exclusive owner of various federally registered and common law trademarks, service marks and trade names including MAKE-A-WISH and MAKE-A-WISH FOUNDATION, as well our swirl-and-star logo (collectively referred to as the "Marks").

12. As a result of the considerable growth and success the Make-A-Wish Foundation has experienced over the years, our Marks have become

increasingly well known and highly regarded throughout the world. In many respects, the Marks constitute our most valuable, indeed priceless, asset.

13. We go to great lengths to protect the Marks, and the substantial goodwill associated therewith, because it is these things that enable us to continue to attract the volunteers, financial resources and other in-kind support we need to carry out our charitable mission.

## The "Chapter Agreement"

14. One of the steps we take to protect the Marks and ensure the delivery of quality services is to require each Make-A-Wish chapter to sign a Chapter Agreement with MAWFA. A true and correct copy of the Chapter Agreement between MAWFA and the Make-A-Wish Foundation of Rhode Island (the "Rhode Island Chapter") is attached hereto as **Exhibit C**.

15. The terms of the Chapter Agreement are not dictated by MAWFA, as one might expect. To the contrary, the initial Chapter Agreement and all subsequent amendments thereto (including the current version adopted in 2004) were approved by a super-majority of chapters. Under our corporate documents, MAWFA cannot amend the Chapter Agreement in any way unless two-thirds of all chapters vote to approve such changes.

16. Pursuant to the Chapter Agreement, chapters are granted the right to use the Marks in a specific geographic area on the express condition that they "strictly comply with various obligations set forth in this Agreement, [MAWFA's] bylaws as the same may be amended from time to time ..., and other policies, rules, resolutions and standards that are promulgated by [MAWFA], whether before or after the Effective Date (the 'Policies')." See Exhibit B, last recital. Similarly, Section 2.3(b) of MAWFA's bylaws states, "Each Chapter shall have the obligation to comply with these bylaws, the Chapter Agreement and all noncontradictory standards, policies and resolutions adopted from time to time by the Board or its designee..."

17. Among the fundamental "duties, warranties and obligations" of chapters set forth in Section 5 of the Chapter Agreement are the following:

> *5.3 Chapter agrees to comply with, and be bound by, the terms of [MAWFA's] Bylaws, this Agreement and the Policies [defined to include our Governing Policies and Performance Standards].*
>
> *5.4 Chapter shall use its best efforts in performing the Foundation's Purpose, in cooperating with [MAWFA] and Other Chapters, and in protecting the Marks and the integrity and good reputation of [MAWFA].*
>
> *5.5 Chapter shall comply with all federal, state, county and local laws, regulations, rules and ordinances applicable to it or relating to nonprofit corporations and charitable organizations.*

18. A true and accurate copy of pertinent portions of MAWFA's Governing Policies, Performance Standards and Guidelines is attached hereto at **Exhibit D.**

19. The reason we insist that all Make-A-Wish chapters adhere to such strict standards is that we subscribe to the adage that "a chain is only as strong as its weakest link." People have come to trust that, if they donate their hard-earned money to the Make-A-Wish Foundation, such funds will be handled responsibly in a fiduciary manner and put to good use by an organization that values accountability, transparency and sound governance practices. We are cognizant of the fact that, particularly in this electronic age, inappropriate actions on the part of one Make-A-Wish entity have the very real potential of adversely impacting other Make-A-Wish entities, as well as the excellent reputation we have all strived so hard to earn.

20. Under MAWFA's corporate documents, the authority to impose discipline on chapters that violate their obligations rests with the Chapter Performance Committee ("CPC"). In accordance with MAWFA's Bylaws, the CPC is comprised of four MAWFA board members (most if not all of whom previously served as a member and/or chair of the board of directors of a Make-A-Wish chapter) and three chapter representatives (all of whom are current or former chapter board members or employees). No employees of

MAWFA serve on the CPC, and all seven CPC members serve on the Committee on a strictly volunteer basis.

21. Section 15 of the Chapter Agreement specifies that chapter discipline can only be imposed by the CPC at a duly noticed "Chapter Action Meeting." Chapters that are the subject of possible disciplinary action have the right to submit a written statement of their position and to participate in the Chapter Action Meeting if they do so in a timely fashion.

22. Section 11 of the Chapter Agreement expressly provides: "If Chapter is in breach of its obligations under this Agreement, [MAWFA's] Bylaws or the Policies (a 'Breach'), the Chapter Performance Committee shall have the power to place Chapter on 'Probation' as described in Section 12, 'Inactive Status' as described in Section 13 or impose Revocation as described in Section 14."

23. Chapters' obligations upon Revocation are spelled out in Section 14 of the Chapter Agreement. Such obligations include, *inter alia:* (a) ceasing to use the Marks or claiming to be associated with MAWFA in any way; (b) turning over the chapter's books and records; (c) providing an accounting of all funds received and disbursed by the chapter; (d) transferring all chapter assets to MAWFA (such funds have always been used to grant wishes in the chapter's former territory); and (e) taking any other actions deemed reasonably necessary to disassociate the chapter and MAWFA.

24. In the relatively rare instances when a chapter's status as a MAWFA chapter has been revoked voluntarily or involuntarily in the past, MAWFA's primary objective has always been to ensure that eligible children in the chapter's former territory continue to have their wishes granted in as seamless a manner as possible, utilizing the funds previously raised in that territory.

25. Decisions of the CPC imposing discipline on chapters (i.e., Probation, Inactive Status and/or Revocation) can be appealed to the Executive Committee of MAWFA's board of directors pursuant to Section 17 of the Chapter Agreement. Under Section 17.3 of the Chapter Agreement, "The decision of the Executive Committee on the appeal shall be final and unappealable."

26. By design, decisions of the CPC and/or the Executive Committee involving the imposition of chapter discipline are not subject to further adjudication by arbitration or litigation. This is why Section 21.2 of the Chapter Agreement expressly states, "All disputes between [MAWFA] and Chapter regarding chapter discipline shall be governed exclusively by and within the rules established in this Agreement, [MAWFA's] Bylaws and the Policies." *See also* Section 21.3, which provides: "In no event shall Chapter institute any action or proceeding against [MAWFA] in any court, whether local, state or federal."

**Violations Committed By**
**<u>the Rhode Island Chapter</u>**

27. In late February 2008, MAWFA learned that the IRS Form 990s filed by the Rhode Island Chapter for fiscal years 2005 and 2006 failed to disclose the compensation of the Chapter's CEO as an officer and/or key employee – as expressly required by the IRS – and, in some instances, affirmatively misrepresented the compensation of all Rhode Island Chapter officers, directors and key employees as "$0" or "None."

28. Pertinent portions of the IRS Forms 990s in question -- which were prepared by Frank Melucci (a CPA who serves as the Rhode Island Chapter's Treasurer) and signed by Dr. Diana Hackney (the Rhode Island Chapter's President & CEO) "under penalties of perjury" -- are attached as **Exhibits E** and **F**. In accordance with the Court's rules on electronic filing, MAWFA has redacted the full names of these minor children and other identifying information from the pertinent exhibits. As filed by the Rhode Island Chapter with the IRS, the attached Form 990s contained no redactions.

29. The Rhode Island Chapter's Form 990s were untrue, incorrect and incomplete in at least the following respects:

> **<u>Part II, line 25</u>.** Asked to disclose the "Compensation of officers, directors, etc.," the Rhode Island Chapter left the line blank for FY 2005 and expressly stated "$0" for FY 2006;

> **<u>Part V</u>.** Asked for information about "Current Officers, Directors, Trustees and Key Employees" during the year ("even if they were not compensated"), the Rhode Island Chapter referred to an attached "Statement 6" but expressly stated "$0" under the heading "Compensation";
>
> **<u>Statement 6</u>.** Although entitled "List of Officers, Directors, Trustees and Key Employees," the Rhode Island Chapter's attached Statement 6 did not include Dr. Hackney, who as President & CEO was clearly an "Officer" and/or a "Key Employee"; and
>
> **<u>Schedule A</u>.** Asked to list the "Compensation of the Five Highest Paid Employees Other Than Officers, Directors and Trustees," the Rhode Island Chapter expressly stated "None," thereby misrepresenting that there were no "employees paid more than $50,000."

30. In order to fully appreciate why MAWFA takes matters like this so seriously, it is important to understand that the IRS Form 990 serves as the primary document providing information about a charity's finances, governance, operations and programs for federal regulators, state charity officials, charity watchdog agencies and the public at large. This is one of the reasons why the IRS requires charities to post their Form 990s online or otherwise make them readily available to the public.

31. Aware that donors rely on the accuracy of Form 990s when deciding which charities to support, the IRS also requires that the document be signed "under penalties of perjury" -- with the signatory declaring under oath "*that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief it is true, correct,*

*and complete. Declarations of preparer (other than officer) is based on all information of which preparer has any knowledge."*

32. Full and complete disclosure of officer and executive compensation is a critical element of the IRS Form 990. The IRS has required nonprofits to report the compensation paid to their officers on the Form 990 in some form or another for almost 40 years. More than 15 years ago, the IRS added "key employees" to this section in order to prevent charities from circumventing the disclosure requirements by claiming a top executive was, in fact, not an "officer." Not long thereafter, the IRS began requiring that organizations also list on the Form 990 their top five other employees earning more than $50,000 in total compensation.

## The CPC Hearing and Decision

33. By letter dated February 28, 2008 (a copy of which is attached as **Exhibit G**), the Rhode Island Chapter was notified the CPC would be considering imposing discipline "up to and including revocation of [Chapter's] affiliation with the Make-A-Wish Foundation" during a Chapter Action Meeting on March 12, 2008.

34. As was its right under Section 15 of the Chapter Agreement, the Rhode Island Chapter submitted a timely written statement of its position which was promptly distributed to members of the CPC (a copy of which is

attached as **Exhibit H**). The Rhode Island Chapter thereafter presented its case at the March 12, 2008 Chapter Action Meeting.

35. In its written submission and its oral presentation at the Chapter Action Meeting, representatives of the Rhode Island Chapter admitted that the failure to disclose the compensation of the Chapter's CEO as an officer and/or key employee in the Chapter's IRS Form 990s had been intentional -- not inadvertent -- for the purpose of not having people learn of the CEO's compensation.

36. After considering the Chapter's position, members of the CPC voted unanimously to revoke the Rhode Island Chapter's status as a MAWFA chapter and to concurrently place the Chapter on Probation based on its violations of the following obligations:

***Chapter Agreement***

*5.3 Chapter agrees to comply with, and be bound by, the terms of Foundation's Bylaws, this Agreement and the Policies.*

*5.4 Chapter shall use its best efforts in performing the Foundation's Purpose, in cooperating with Foundation and Other Chapters, and in protecting the Marks and the integrity and good reputation of Foundation.*

*5.5 Chapter shall comply with all federal, state, county and local laws, regulations, rules and ordinances applicable to it or relating to nonprofit corporations and charitable organizations.*



A/72547509.2

***"Governance and Legal" Governing Policy***

*Chapters shall adhere to the highest legal and ethical standards, protecting the name, reputation, and intellectual property of the Foundation, ensuring sound nonprofit management and governance, and maintaining positive relationships within the Make-A-Wish network.*

***Performance Standards***

***GL 6.2 Applicable Laws****. Chapters shall comply with all applicable federal, state and local charity laws, ordinances, standards and regulations.*

***GL 6.3 Other Standards****. Chapters shall comply with the BBB Wise Giving Alliance's "Charity Standards" (http://www.give.org/standards/newcbbbstds.asp) and the Association of Fundraising Professionals' "Code of Ethical Principles and Standards of Professional Practice" (http://www.afpnet.org/ethics/guidelines_code _standards).*

37. In addition to the above violations, the CPC found that the Rhode Island Chapter also violated the following Performance Standard by appending to its Form 990s confidential information about wish children, although such information was not required by the IRS:

***GL 2.5 Confidential Information****. Chapters shall maintain the confidentiality of donor, volunteer, personnel and wish family information, and shall not disclose any such information to anyone outside the Make-A-Wish Foundation without the prior written permission of the affected individual or entity, unless otherwise required by applicable state law or the National Office.*

**The Executive Committee Appeal**

38. The Rhode Island Chapter was notified of the CPC's decision by letter dated March 14, 2008 (a copy of which is attached as **Exhibit I**). As

was its right under Section 17 of the Chapter Agreement, the Rhode Island Chapter filed a timely notice of appeal to MAWFA's Executive Committee on April 16, 2008 (a copy of which is attached as **Exhibit J**).

39. I responded to the Rhode Island Chapter's notice of appeal in a letter dated April 18, 2008 (a copy of which is attached as **Exhibit K**), in which I, among other things, encouraged the Chapter to submit any pertinent documents in support of its position "as early as possible, in order to provide Committee members with sufficient time to review the material before the hearing." By e-mail dated April 26, 2008 (attached as **Exhibit L**), I thereafter advised counsel for the Rhode Island Chapter that the Executive Committee hearing had been scheduled for May 15, 2008, and inquired again whether the Chapter planned to submit any additional materials prior to the hearing and, if so, when.

40. On May 9, 2008 -- the Friday before the Executive Committee hearing -- the Rhode Island Chapter submitted a Memorandum and three affidavits in support of its appeal, along with more than 1,100 pages of material consisting of 38 "potential exhibits" and 188 "Liability Release and Authorization Re: Medical Information and Publicity" forms.

41. Given the volume of material submitted and the relatively short period of time remaining before the hearing, I scanned and e-mailed the Memorandum, affidavits, index of exhibits and a sample Release and

Authorization form to Executive Committee members that day. By Monday, May 12, 2008, all of the other documents submitted by the Rhode Island Chapter had been scanned and uploaded to a File Transfer Protocol ("FTP") site and Executive Committee members had been provided with appropriate instructions for accessing the FTP site.

42. On Tuesday, May 13, 2008, after reviewing the material submitted by the Rhode Island Chapter, MAWFA's Director of Chapter Support and Senior Manager of Mission Resources signed sworn declarations addressing various points raised in the Chapter's Memorandum. I forwarded those declarations to Executive Committee members and the Rhode Island Chapter's attorneys that day. The Rhode Island Chapter submitted a response to the declarations the following day, which was promptly forwarded to members of the Executive Committee.

43. On the morning of the Executive Committee hearing, counsel for the Rhode Island Chapter sent me an e-mail in which he asked, "If the revocation is approved or confirmed, would the Committee be willing to allow a stay until AAA arbitration is filed? I ask this in an effort to assist the RI Chapter with its on-going wish granting efforts." I responded as follows:

> *With regard to your question about the possibility of a stay in the event the CPC decision is affirmed, I need to point out this is not a matter that is subject to arbitration and/or further appeal. See Chapter Agreement, Section 17.3 (*"The decision of the Executive Committee on the appeal shall be final and unappealable"*) and Section 21.2 (*"All disputes between Foundation and Chapter

> regarding chapter discipline shall be governed exclusively by and within the rules established in this Agreement, Foundation's Bylaws and the Policies"). *However, with regard to your concern about the Chapter's ongoing wish granting efforts, I can assure you without any hesitation that, in situations like this, our primary objective here at National is to ensure that children in the affected territory are not disadvantaged in any way and that wishes continue to be granted in a seamless fashion during the winding down/transition process.*
>
> *I'll be happy to discuss the matter with you in greater detail – but first let's see what the Executive Committee decides ...*

(A copy of counsel's e-mail and my response are attached as **Exhibit M.**)

44. In accordance with Section 17 of the Chapter Agreement, the Executive Committee conducted a hearing on Thursday, May 15, 2008, during which representatives of the Rhode Island Chapter (including its counsel) and the CPC were permitted to present evidence and to make arguments in support of their respective positions. Once again, the Rhode Island Chapter admitted that, notwithstanding Dr. Hackney's sworn declaration, it made a deliberate and conscious decision not to include in its Form 990s the CEO compensation information required by the IRS. Following the hearing, and after careful deliberations, members of the Executive Committee voted unanimously to uphold the CPC's decision to revoke the Rhode Island Chapter's status as a MAWFA chapter.

45. I informed counsel for the Rhode Island Chapter of the Executive Committee's decision on Friday, May 16, 2008, at which time I also explained that two MAWFA representatives would be visiting the Rhode

Island Chapter offices on Tuesday, May 20, 2008, in order to gather information and to begin the process of planning for what MAWFA hoped would be an orderly transition that would ensure that wish granting in Rhode Island continued in as seamless a manner as possible. There was no plan for the MAWFA representatives to dispossess the Rhode Island Chapter from its offices, to immediately seize assets, or to take any other precipitous action during their visit. To the contrary, the intent was to work cooperatively with Chapter representatives on an orderly transition that would be in the best interest of the Make-A-Wish Foundation and the children we serve and in full compliance with the requirements of Rhode Island law.

46. In a voice mail message left at 10:12 a.m. (Arizona time) on Monday, May 19, 2008, counsel for the Rhode Island Chapter advised me for the first time that his client had authorized and directed him to seek a temporary restraining order and injunctive relief with regard to the imposition of Revocation. In a telephone conversation later that day, I informed counsel that one of the two MAWFA representatives scheduled to visit the Rhode Island Chapter offices was already en route, having boarded her plane more than an hour before he left his initial voice mail message for me.

47. When I suggested the visit take place as planned given the fact that it was too late to cancel the trip, another attorney in the firm representing the Rhode Island Chapter suggested his client would "bar the [expletive deleted] door" and call the police if the MAWFA representatives attempted to enter the Chapter offices. I informed counsel that I would not subject a valued MAWFA employee to such a hostile environment and would tell her to return to Phoenix once she got off the plane. At no time, however, did I "consent" to the entry of a temporary restraining order.

48. As I have explained to counsel for the Rhode Island Chapter, whenever a Make-A-Wish chapter has been shut down either voluntarily or involuntarily in the past, MAWFA has always made sure that funds raised in the chapter's former territory continue to be used to grant the wishes of children residing in that territory, in accordance with the donors' intent. That is our intention in this case as well.

Executed on May 30, 2008 at Phoenix, Arizona.

David B. Mulvihill