# EXHIBIT G

**Make-A-Wish Foundation® of America**
3550 North Central Avenue, Suite 300
Phoenix, Arizona 85012-2127
602-279-WISH, 800-722-WISH
602-279-0855 fax
www.wish.org

MAKE-A-WISH.

February 28, 2008

*By E-Mail*

Mary Lou Schoettler, Board Chair
Dr. Diana Hackney, President & CEO
Make-A-Wish Foundation of Rhode Island
757 Park Avenue, 2nd Floor
Cranston, RI 02910

Re: Notice of Chapter Action Meeting

Dear Mary Lou and Diana:

This is to inform you we are asking the Chapter Performance Committee ("CPC") to hold a Chapter Action Meeting on Wednesday, March 12, 2008 at 4:00 p.m. (EST) to consider imposing discipline on your chapter -- up to and including revocation of your affiliation with the Make-A-Wish Foundation -- based on what appear to be egregious mistakes made in conjunction with the Form 990s that your chapter filed with the IRS and the Rhode Island Department of Business Regulation/Charitable Organizations Section for fiscal years 2005 and 2006.

Specifically, we were shocked and disappointed to discover yesterday that your chapter:

1. failed to disclose Diana's compensation and benefits in Part V-A of the Forms 990s and/or on Schedule A thereto, as expressly required by the IRS;

2. affirmatively represented on Schedule A as a fact something that simply is not true, i.e., that your chapter has no employees who are paid more than $50,000 per year; and

3. appended to the Form 990s confidential information about the children for whom you granted wishes during the year in question.

As you are (or certainly should be) aware, the Form 990s that nonprofit organizations file with the IRS serve as the primary document providing information about the organization's finances, governance, operations and

programs for federal regulators, state charity officials and the public at large. This is the reason why, for example, the IRS requires the Form 990 to be posted online and/or otherwise be made readily available to the public. It is also why the person signing the Form 990 on behalf of the organization is required "[u]nder penalties of perjury [to] declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct and accurate."

Although I hope the reasons for our concern are obvious, I have attached two articles which may help you better understand why we believe severe punishment, including possible revocation, may well be imposed under these circumstances.

The first article (entitled "Learn from the experience of not-for-profit giants") was published by Grant Thornton earlier this month. Noting that "[t]he Senate Finance Committee has been investigating and questioning many large and prestigious not-for-profit organizations during the past few years," the article identifies several "Congressional 'hot buttons'," including "Executive compensation" and "Transparency: The IRS Form 990 must be complete and accurate." The article concludes with the following sage advice:

> *Evidenced by the many painful experiences of large, midsize and even smaller not-for-profit organizations, it is very costly to make corrections and build a case after the fact when faced with the scrutiny of Congress, the IRS, the media and/or the public...*
>
> *Who would have thought that large, national not-for-profit organizations, rich in resources and sophistication, would have to withstand such challenging scrutiny?*
>
> *Take a lesson from the experience of the not-for-profit giants and don't learn the hard way.*

*See* Ex. A.

The second article (entitled "Rooting Out Errors on Charity Tax Forms"), which was published in the *Chronicle of Philanthropy* this past year, explains that the IRS had completed a two-year review of executive compensation at nonprofit organizations, finding serious problems with charities "fail[ing] to provide complete and accurate information about the salary and benefits paid to

top officials." Under the heading "'Inexcusable Lack of Disclosure'," the article goes on to state:

> *For many charities, the most serious outcome of the salary investigation may be a decision by Congress or the IRS to impose new penalties on organizations that submit incomplete or incorrect information on their tax returns. Some lawmakers lambasted nonprofit groups for their mistakes after the results of the investigation were released, saying that the informational tax return, known as Form 990, is supposed to be a window into a charity's finances and operations for both regulators and the public.*
>
> *Max Baucus, a Montana Democrat who chairs the Senate Finance Committee, said he was "deeply concerned" about the errors. The committee's leading Republican, Sen. Charles E. Grassley of Iowa, said: "The lack of transparency is inexcusable."*

*See* Ex. B.

We have worked very hard over the years to earn the trust not only of the IRS, the Senate Finance Committee[1] and state charity regulators, but also that of the general public upon whose generosity we depend to carry out our charitable mission. By failing to provide accurate answers to straightforward questions on the Form 990 that are designed to elicit important information to which the public is clearly entitled -- and by publicly disseminating confidential information about the wish children we are privileged to serve -- your chapter has jeopardized the Make-A-Wish Foundation's good name and reputation.

Based on the foregoing, your chapter's actions appear to have violated the Chapter Agreement, as well as our Governing Policies and Performance Standards, as follows:

---

[1] We have worked closely with the Senate Finance Committee in the past, in conjunction with our ongoing battle against sound-alike organizations. In a personal letter to MAWFA's board chair and CEO a few years ago, Senator Grassley "applauded" us for our dedication to our mission and added: "I also recognize that Make-A-Wish excels in prioritizing accountability and transparency in satisfying this mission. I consider these values necessary to maintaining the public's trust and generosity."

**Chapter Agreement**

*5.3 Chapter agrees to comply with, and be bound by, the terms of Foundation's Bylaws, this Agreement and the Policies.*

*5.4 Chapter shall use its best efforts in performing the Foundation's Purpose, in cooperating with Foundation and Other Chapters, and in protecting the Marks and the integrity and good reputation of Foundation.*

*5.5 Chapter shall comply with all federal, state, county and local laws, regulations, rules and ordinances applicable to it or relating to nonprofit corporations and charitable organizations.*

**Governance and Legal**
**Governing Policy**

*Chapters shall adhere to the highest legal and ethical standards, protecting the name, reputation, and intellectual property of the Foundation, ensuring sound nonprofit management and governance, and maintaining positive relationships within the Make-A-Wish network.*

**Performance Standards**

*GL 2.5 **Confidential Information**. Chapters shall maintain the confidentiality of donor, volunteer, personnel and wish family information, and shall not disclose any such information to anyone outside the Make-A-Wish Foundation without the prior written permission of the affected individual or entity, unless otherwise required by applicable state law or the National Office.*

*GL 6.2 **Applicable Laws**. Chapters shall comply with all applicable federal, state and local charity laws, ordinances, standards and regulations.*

*GL 6.3 **Other Standards**. Chapters shall comply with the BBB Wise Giving Alliance's "Charity Standards" (http://www.give.org/standards/newcbbbstds.asp) and the Association of Fundraising Professionals' "Code of Ethical*

*Principles and Standards of Professional Practice" (http://www.afpnet.org/ethics/guidelines_code_standards).*

Pursuant to Section 15 of the Chapter Agreement, your chapter has the rights: (a) to submit a written statement regarding the proposed action to MaryJane Irwin, our Corporate Secretary, on or before Monday, March 10, 2008; and (b) to appear at the Chapter Action Meeting if a written statement has been timely filed.

If you have any questions about this matter, please feel free to contact Deborah Thompson, Director of Chapter Performance, at (800) 722-9474 (ext. 5148) or dthompson@wish.org; or me at (800) 722-9474 (ext. 5102) or dmulvihill@wish.org.

Very truly yours,

*/s/ David B. Mulvihill*

David B. Mulvihill
Vice President & General Counsel

Attachments (Ex. A and B)

cc: Rhode Island Chapter Board Members
Larry Byar, Chapter Performance Committee Chair
Phil Boudreau, VP & Chief Operating Officer
Deborah Thompson, Director of Chapter Performance
Susan Sewell, Senior Manager, Chapter Performance
MaryJane Irwin, Corporate Secretary



# Learn from the experience of not-for-profit giants

*By Tax Senior Manager Laura Kenney*

The Senate Finance Committee has been investigating and questioning many large and prestigious not-for-profit organizations during the past few years. The line of questioning has been very deep and very telling. The Senate Finance Committee and Internal Revenue Service (IRS) have requested detailed records regarding governance matters going back 11 years in one widely publicized instance. And there was a critical line of questioning regarding the rationale for continuing tax-exempt status in a lengthy letter request to another nationally well-known organization. In another letter, the Senate Finance Committee questioned and requested e-mail correspondence of upper management from a not-for-profit organization that is a national treasure.

How would such a letter from the Senate Finance Committee affect your organization?

**Congressional "hot buttons"**

There are common themes throughout the Senate Finance Committee's letter-writing campaigns questioning these giants in the not-for-profit community. Some of the themes of their letters and calls include:

- Executive compensation, especially fringe benefits, deferred compensation, incentive compensation and expense accounts.
- Related organizations and joint business ventures with commercial companies: Is there any private benefit or opportunity for private benefit, and who controls charitable dollars?
- Governance matters: Governance is perceived as a core problem, including tone from the top down.
- Endowments: How are they managed, how are they spent, and what is the ratio of dollars in to dollars out?
- Commercialization: Activity that is also performed in the for-profit world.
- Health care: Are health systems doing enough to benefit the community? If not, do they deserve a big tax break in the form of tax-exempt status?
- Transparency: The IRS Form 990 must be complete and accurate. Record keeping must accurately reflect activity, revenues, expenditures and related-party information.

The Senate Finance Committee has also put tremendous pressure on the IRS to study, audit and report on the level of compliance with tax laws by tax-exempt organizations. As a result, the IRS has been doing compliance checkups to gather information regarding fundraising practices, compensation practices and the level of charitable care, as well as compensation practices of the hospital industry, and compliance with regard to the use of tax-exempt bonds.

**How will this affect you?**

The new Form 990 proposes additional information your organization would need to gather and report, which would increase disclosure to the IRS and, therefore, to the public, including the following areas:

- Disclosure about governance practices.
- Expanded executive compensation reporting, including reporting of nontaxable compensation.
- Increased disclosure on lobbying activities.
- Detailed hospital charity care schedules.
- Transaction details between the tax-exempt organization and insiders.
- Related-entity explanations.
- Foreign activity and account details.
- Details about non-cash contributions and fundraising activities.

**What additional resources will be needed?**

Not-for-profit organizations need vibrant resources, including qualified and attentive board members, strong fiscal management and access to technical industry-specific expertise. This will enable organizations to ensure that their missions are carried out, to implement and adhere to best governance practices, and to comply with regulatory and tax rules.

New developments, ideas, programs, funding sources, changing rules and regulations and personnel turnover force organizations to continually and actively monitor their adherence to their tax-exempt purpose.

Evidenced by the many painful experiences of large, midsize and even smaller not-for-profit organizations, it is very costly to make corrections and build a case after the fact when faced with the scrutiny of Congress, the IRS, the media and/or the public. In the long run, it is more efficient to put qualified people, strong record-keeping systems and good governance policies in place upfront.

Who would have thought that large, national not-for-profit organizations, rich in resources and sophistication, would have to withstand such challenging scrutiny?

Take a lesson from the experience of the not-for-profit giants and don't learn the hard way. ■

EXHIBIT A

THE CHRONICLE OF PHILANTHROPY

http://philanthropy.com/premium/articles/v19/i11/11003301.htm (3-22-07)

# Rooting Out Errors on Charity Tax Forms

**IRS weighs new penalties on nonprofit groups after salary investigation turns up pattern of mistakes**

By Elizabeth Schwinn

Washington

Now that it has completed its two-year investigation of executive compensation at nonprofit organizations, the Internal Revenue Service is weighing whether to impose new penalties on charities and foundations that fail to provide complete and accurate information about the salary and benefits paid to top officials.

In addition, the IRS says it will continue to examine nonprofit pay closely because its investigation showed what it considered to be a troubling number of errors by nonprofit organizations.

The study, which examined the informational tax returns of 1,826 charities and foundations, found that almost half of them had made mistakes.

Nearly 400 did such a poor job of filling out their forms that they had to file amended returns. The IRS sent written warnings to 115 organizations that it said engaged in improper practices, and imposed $21-million in penalties on officials at 25 groups it said had substantially overcompensated their leaders.

Under federal law, people who receive overly high pay, and those who approve such compensation — including board members of nonprofit organizations — are assessed penalties.

More penalties could be imposed, said IRS officials, who are still working on 77 audits related to the investigation.

The tax agency said that fewer than 15 percent of the charities and foundations with improper compensation practices tried to fix their problems before the IRS caught up with them, even though the law that governs excessive pay and benefits rewards officials who correct problems themselves by charging them much lower penalty fees than they would normally owe.

"What we saw was that there wasn't a lot of self-reporting or fixing of excessive amounts," said Ronald J. Schultz, senior technical adviser for the IRS's tax-exempt and government-entities division. "If self-reporting is nonexistent, you have to have some kind of enforcement for the system to work."

## 'Inexcusable' Lack of Disclosure

For many charities, the most serious outcome of the salary investigation may be a decision by Congress or the IRS to impose new penalties on organizations that submit incomplete or incorrect information on their tax returns. Some lawmakers lambasted nonprofit groups for their mistakes after the results of the investigation were released, saying that the informational tax return, known as Form 990, is supposed to

EXHIBIT B

be a window into a charity's finances and operations for both regulators and the public.

Max Baucus, a Montana Democrat who chairs the Senate Finance Committee, said he was "deeply concerned" about the errors. The committee's leading Republican, Sen. Charles E. Grassley of Iowa, said: "The lack of transparency is inexcusable."

One lawyer who represents charities says that many of the errors are made by the accountants whom charities hire to assemble their returns.

Charles M. Watkins, a Washington lawyer, said he has found mistakes in a number of the forms he has been asked to review for clients.

"The errors I'm seeing are ones that I think a reasonable accountant ought not to make," he said.

Some charity officials disputed some of the report's conclusions, including Diana Aviv, president of Independent Sector, a coalition of charities and foundations in Washington that is leading an effort to develop principles to help nonprofit groups stomp out abuses on their own, rather than through government regulation.

Ms. Aviv pointed out that at least 85 percent of the charities and foundations the IRS surveyed reported compensation properly on their Form 990 returns, although many made other mistakes on those and other tax forms. That statistic, she said, shows that although some bad actors may try to beat the system, the vast majority of groups do not.

"A lot of this is about good practice," she said. "If the sector develops standards, it provides organizations with an opportunity to do the right thing."

**Protesting Penalties**

Many charity lawyers said the last word has yet to be written on the IRS investigation. The people the IRS penalized are likely to challenge the tax agency, they said, and the penalties could be reduced or even eliminated entirely.

Nancy Ortmeyer Kuhn, a Washington lawyer, said she represents some organizations that are fighting the revenue service over compensation issues. "I predict we'll win," she said.

The salary investigation — the largest such effort carried out to date by the IRS — was a learning experience for the tax agency as it sought to apply a law enacted in 1996 that gives the agency the authority to fine charity officials for receiving salaries and other benefits that are deemed excessive, as well as to penalize trustees who approve the compensation. It is known as the intermediate-sanctions law because it gives officials an alternative to revoking a charity's tax-exempt status.

In part because of the salary investigation, the IRS has now rewritten the Form 990 to require more details about compensation and to spell out the reporting requirements more clearly. It will revisit the section on compensation when it issues a fully revised Form 990 this summer, Mr. Schultz said.

Among the other findings of the investigation:

**A pattern of mistakes.** The IRS said that each of the 50 groups it contacted that paid more than $250,000 in compensation had made exactly the same mistake: failing to include a schedule that showed

who received the compensation and how much money each person was paid.

Mr. Schultz said the IRS did not try to determine whether the errors on the returns were deliberate, but said it is considering whether to impose relatively high penalties in the future for improper reporting, based on the importance of the missing information.

"We have to ask, when you have significant errors on the 990, what should the consequence be?" he said.

**Excessive benefits.** Serious problems at organizations weren't limited to excessive pay or bonuses, the revenue service said, but included payments for vacation homes, cars, legal fees, personal meals, and gifts that were not reported as compensation. In at least one case, the IRS said, a charity paid more to a business owned by one of the charity's top officials than its services were worth.

**Loans.** The IRS said one of the most significant problems it found was improper loans by charities and foundations to their top executives. Of the groups that made loans, 53 percent offered terms that were lower than commercial rates, and 31 percent of officials failed to repay their loans as promised.

The IRS is following up with a new investigation into loans made by 250 organizations.

**High — but legal — pay.** Many charities paid executives or trustees salaries or benefits that the public might consider excessive, but because those groups complied with the law, the IRS took no actions against them, Mr. Schultz said.

The intermediate-sanctions law allows charities to pay top officials based on what other similar organizations are paying their leaders. When it passed the 1996 law, Congress directed the IRS to let charities compare their compensation to that of for-profit businesses, a decision that has been hotly debated ever since.

A copy of the report on the investigation is available online under the heading "EO Executive Compensation Project Report."

Copyright © 2007 The Chronicle of Philanthropy