UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MAKE-A-WISH FOUNDATION OF RHODE ISLAND, INC., Plaintiff, | : | |
| v. | : | C.A. No. 08-cv-206-S |
| MAKE-A-WISH FOUNDATION OF AMERICA, Defendant | : | |

**PLAINTIFF'S OPPOSITION TO MOTION TO LIFT TEMPORARY STAY OF DEFENDANT, MAKE-A-WISH FOUNDATION OF AMERICA**

Now comes the Plaintiff, Make-A-Wish Foundation of Rhode Island, Inc. ("RI Chapter") and hereby opposes the Motion to Lift Temporary Stay filed by Defendant, Make-A-Wish Foundation of America ("MAWFA"). In addition, and consistent with this Opposition, the RI Chapter requests that its Motion for Preliminary Injunction be granted.

Finally, the MAWFA has recently violated the Temporary Restraining Order which is in existence. The RI Chapter seeks reparations for said violation and an express Order requiring the MAWFA to cease and desist from its offending behavior.

For the Plaintiff's
By its counsel

/s/ Todd D. White, Esq.________________
TODD D. WHITE #5943
VICTORIA M. ALMEIDA #1755
E. HANS LUNDSTEN #1156
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
T: (401) 274-7200
F: (401) 351-4607
Dated: June 16, 2008

**CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of June 2008, I electronically filed the attached document with the Court using the ECF system. The following counsel of record are registered with the Court and will be served electronically through the ECF system:

State of Rhode Island
Patrick C. Lynch, Esq.
Office of the Attorney General
150 South Main Street
Providence, RI 02903

Carol E. Head, Esq.
Bingham, McCutchen, LLP
One Federal Street
Boston, MA 02110

/s/ Todd D. White, Esq.___________

*456372_1.doc*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MAKE-A-WISH FOUNDATION OF RHODE ISLAND, INC., Plaintiff, | : | |
| v. | : | C.A. No. 08-cv-206-S |
| MAKE-A-WISH FOUNDATION OF AMERICA, Defendant | : | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF OPPOSITION TO MOTION TO LIFT TEMPORARY STAY OF DEFENDANT, MAKE-A-WISH FOUNDATION OF AMERICA**

## I. SUMMARY POSITION

Defendant, Make-A-Wish Foundation of America ("MAWFA") acting as prosecutor, judge, jury and executioner, seeks to apply the death sentence to the Make-A-Wish Foundation of Rhode Island ("RI Chapter") without permitting the RI Chapter to even seek review or the intervention of an impartial or neutral arbitrator, as is required in the arbitration provision of the Chapter Agreement between the parties. Said "death sentence" has not been imposed because the RI Chapter embezzled funds, cheated donors, harmed children or even failed to fulfill its local mission. On the contrary, the termination of the RI Chapter is based on the MAWFA's larger goal to consolidate chapters throughout the nation. As part of this larger plan, the MAWFA seized upon the manner in which the RI Chapter filled out its IRS Forms 990 for 2005 and 2006 as its purported basis for closing down the entire RI chapter's operations.

Having summarily ordered the termination of the RI Chapter using a sham one-sided "hearing" process, the MAWFA now refuses to permit an objective fact-finder to determine whether the RI Chapter's conduct warrants termination of it existence. Fearing that an objective review of the circumstances underpinning this dispute will show that the draconian measure sought be the MAWFA is not only ludicrous, but does not even begin to satisfy basic notions of fairness and due process, the MAWFA now fights zealously to prevent this Court from taking even a cursory look at the agreement between the parties and affording the RI Chapter injunctive relief and arbitration.

Under the plain language of the Chapter Agreement between the parties, the MAWFA has no such absolute right to summarily terminate the RI Chapter. Under the provisions of Section 21 of the Chapter Agreement relating to arbitration, an arbitrator who presumably acts as a neutral fact-finder must determine that the actions undertaken by the RI Chapter actually warrant the revocation of its charter or other more appropriate disciplinary action. If this occurs, the RI Chapter will have been accorded the appropriate hearing. However, short of allowing at least one neutral and objective fact-finder to review the circumstances of this case, the RI Chapter will be divested of all its assets and an end will be put to the charitable work it has undertaken for the past seventeen (17) years.

Common sense dictates that the seriously ill children of Rhode Island should not be punished as a result of the listless allegations asserted by the MAWFA. Neither do the principles of natural justice nor the concept of due process allow the MAWFA to act as the prosecutor, judge, jury and ultimately executioner of an independent corporation without some objective review.

## II. SUMMARY ALLEGATIONS

The allegations leveled by the MAWFA revolve around whether the RI Chapter, a local charity, properly filled out its 2005 and 2006 IRS Form 990. The RI Chapter, as a local charity, has its own IRS exemption and as a result files its own Form 990. Its Form 990 does not become part of the national organization's Form 990. The RI Chapter's two Forms 990 in question were prepared and executed by its local accountant, who signed those returns as the preparer, thereby indicating his belief that the forms complied with controlling Internal Revenue Service ("IRS") regulations. There are no pending accusations of federal, state or local law violations.

In a February 28, 2008 letter from the MAWFA Vice President and General Counsel, David B. Mulvihill, MAWFA leveled three specific allegations against the RI Chapter as grounds for initiating a CPC "hearing" to determine if disciplinary action against the RI Chapter was warranted. However, contrary to the representation made in MAWFA's brief, in paragraph three of the March 14, 2008 correspondence from Chapter Performance Committee Chair, Lawrence J. Byar to the RI Chapter, in which the MAWFA determined that disciplinary action was warranted, only <u>two</u> bases for revocation remained:

1. Failure to disclose the Chapter's president's salary on the 2005 and 2006 Forms 990; and,

2. The disclosure of confidential information regarding wish children on the attached schedule to the same two Forms 990.

With respect to the first "allegation," the "BACKGROUND" section below elucidates in detail the reasons that this assertion is without substance. With respect to the second "allegation," the MAWFA accused the RI Chapter of providing confidential

information about wish recipients and their families in its 2005 and 2006 Form 990s.[1] However, as the MAWFA is well aware, the RI Chapter has copies of releases signed by wish recipients' families allowing the disclosure of the accused information. Moreover, line 23 of Form 990 requires the charity to "[e]nter the amount of payments to, or for the benefit of, particular clients or patients." The RI Chapter did so, attaching a schedule and disclosing the specific assistance provided to individuals. It only did so, however, after having the appropriate releases. Now, despite receiving no complaints from the IRS or any of the individuals in question, this "allegation" forms part of the MAWFA's rationale as to why it is justified in revoking the RI Chapter's charter. This is another example of the MAWFA clinging to a contrivance to rationalize its ultimate objective: to consolidate chapters and control assets.

## III. BACKGROUND

The RI Chapter of Make-A-Wish Foundation is one of sixty-seven (67) existing Make-A-Wish Foundation Chapters throughout the United States and its territories. As of 2002, there were eighty-four (84) chapters, but the MAWFA has been on a path of consolidation over the last several years. The RI Chapter appears to be one of the few chapters willing to fight for its existence and not allow itself to be steamrolled through this consolidation process.

By all objective measures, the RI Chapter has been a success. Contrary to statistics provided by the MAWFA, since 1991 the RI Chapter has actually granted the wishes of 932 Rhode Island children fighting life-threatening medical conditions. Ironically, in September of 2007, the RI Chapter was recognized by the MAWFA at the national Make-A-Wish conference in Arizona as the recipient of the Outstanding

[1] The RI Chapter has been filing its Forms 990, using this very same method since its inception.

Performance Award. Nevertheless, less than eight months later, the same organization is now seeking to summarily revoke the charter and terminate the RI Chapter.

All charitable organizations are required by the Internal Revenue Service to fill out Form 990. Form 990 is a tax return form that sets forth financial information about the organization. These forms are publicly accessible. Thus, benefactors and recipients alike of a Make-A-Wish chapter can better understand how the organization's assets are being allocated.

Prior to filling out the 2005 and 2006 Forms 990, the RI Chapter's President and C.E.O., Dr. Diana Hackney, had a question as whether her salary needed to be separated out on any line. Seeking guidance about the best way to proceed, Dr. Hackney spoke with national auditor and representative, Steve Hunt, while he was on site doing the RI Chapter's internal audit. Dr. Hackney asked Mr. Hunt whether her salary needed to be set forth individually on the Form 990. Dr. Hackney was told by Mr. Hunt that there was no national policy or even person at that level with whom to consult. Mr. Hunt informed Dr. Hackney that she should simply look at how other chapters filled out their own Form 990 and consult the Chapter's own advisors.

As a result of Mr. Hunt's advice, Dr. Hackney reviewed the Form 990 that the Massachusetts Make-A-Wish Chapter and the New York Make-A-Wish Chapter filled out for their respective areas. In reviewing these forms (and subsequently reviewing a myriad of Forms 990 from other chapters), Dr. Hackney recognized wide disparity in how the forms were completed. By way of example only, the Make-A-Wish Foundation of both Oklahoma and Vermont filled out their respective 2004 and 2005 Form 990 in the

same manner as the RI Chapter – by putting "0" in Line 25 and aggregating "Other salaries and wages" in line 26. (See attached **Exhibit A** and **Exhibit B**).

In her quest for guidance, Dr. Hackney also consulted with Rhode Island Certified public Accountant Frank Melucci with respect to this issue. Mr. Melucci determined that the total RI Chapter salaries and wages, including the C.E.O's compensation, could be aggregated in line 26 and believed it to be an acceptable national policy to fill out the forms in these different ways. Mr. Melucci thereafter signed both the 2005 and 2006 Forms 990 as the preparer. These forms were then filed with the IRS. In addition, pursuant to AF 3.1 of the MAWFA's Standards, the RI Chapter provided copies of these forms to the MAWFA shortly after they were filed with the IRS.

Finally, Dr. Hackney also made these returns, as well as all the RI Chapter's books and records, available to Grant Thornton, the national auditing company selected by the MAWFA to audit the MAWFA and its chapters. The Grant Thornton audit took the better part of five days in 2005. After Grant Thornton reviewed Dr. Hackney's compensation information, as well as the RI Chapter's forms, it did not suggest any corrections, revisions or modifications with regard to the issue at hand.

The RI Chapter relied in good faith on its accountant, the review by Grant Thornton, a review of the Forms 990 filed by other Chapters, conversations with a national representatives and actual submission to the national office. Approximately two years passed without a question about the content of these forms or the information contained therein from any entity.

On February 26, 2008, Dr. Hackney received a telephone call from Jim Taricani, a local Rhode Island television investigative reporter. Mr. Taricani indicated that he had

some questions he wanted to ask Dr. Hackney specifically about the RI Chapter, the Form 990, her compensation, other staff salaries and other means and methods of business and operation.

Following protocol, Dr. Hackney contacted the MAWFA to explain that she had received a media request from Mr. Taricani. She was directed to speak to Brent Goodrich, the Public Relations Director of the MAWFA national office. Mr. Goodrich advised Dr. Hackney to speak with Mr. Taricani and simply inform him that the failure on the part of the RI Chapter to set forth Dr. Hackney's individualized compensation was an oversight.[2] Dr. Hackney was also advised to make the issue go away by saying as little as possible. Sometime later that same day, Dr. Hackney was informed that other national personnel from the MAWFA were going to be involved in the situation. Dr. Hackney was relieved, believing that she would be receiving some assistance in this regard and even sent an e-mail to her board to let them know that the national office was helping with this situation.

On February 27, 2008, Dr. Hackney spoke with Jim Taricani and answered all of his questions. Thereafter, she informed both her board of directors and the MAWFA national office of her conversation and the questions Mr. Taricani had asked her. Ultimately, after their conversation and after Mr. Taricani completed his "investigation," he did not contact Dr. Hackney. Subsequently, one of Mr. Taricani's media associates told Dr. Hackney that Mr. Taricani's lack of follow-up meant there was "no story here."

One day later, on February 28, 2008, Dr. Hackney received a telephone call from Deborah Thompson of the MAWFA national office. Ms. Thompson told Dr. Hackney

[2] In good conscience Dr. Hackney could not tell Mr. Taricani or anyone else the way the Form 990 was filled out was an "oversight." The Forms 990 were filled out in a manner that Dr. Hackney and the RI Chapter were informed was acceptable.

that she would be receiving a "very legal letter" from MAWFA's general counsel, David Mulvihill. Dr. Hackney was not certain what that meant.

Later that day, the RI Chapter received a letter from David Mulvihill. The letter stated that the Chapter Performance Committee ("CPC") of the MAWFA would be holding a "Chapter Action Meeting" on March 12, 2008 at 4:00 p.m. to consider imposing discipline on the RI Chapter "up to and including revocation." The letter outlined three issues the CPC wanted to review, all relating to the way in which the R.I. Chapter filled out its 2005 and 2006 Forms 990. The letter also informed the RI Chapter that it had the opportunity to submit a written statement by March 10, 2008 and that the RI Chapter had the opportunity to "appear at" the Chapter Action Meeting.

On March 7, 2008, the RI Chapter filed a written statement with the CPC. Without any indication that counsel could or should be engaged, the RI Chapter had not even considered legal representation at this point. On March 12, 2008, the RI Chapter was contacted by telephone by the CPC. This telephone call apparently was the method by which the RI Chapter could "appear." MAWFA representative, Lawrence Byar opened the telephone call with the following ominous remark: "We are here to discuss the revocation of the RI Chapter." It appeared a decision had already been formulated.

During the telephone conference call (in contrast to the representations made by the MAWFA in its brief), the RI Chapter was <u>never</u> provided the opportunity to "present its position." Instead, the RI Chapter's chairman of the board, Mary Lou Schoettler read a brief statement and Dr. Hackney and Frank Melucci simply answered a few questions directed to them by members of the CPC. After answering all questions presented, the telephone conference ended. With the exception of Mary Lou Schoettler's statement,

nobody from the RI Chapter was asked or permitted to articulate the RI Chapter's position, rationale or defense on any matter.

Two days later, on March 14, 2008, Mr. Byar of the CPC wrote to the RI Chapter indicating that the CPC unanimously voted to revoke the charter of the RI Chapter.[3] The letter provided two reasons for the revocation: 1) the disclosure of confidential wish recipients on the 2005 and 2006 Forms 990; and 2) the non-disclosure of the CEO's salary on the 2005 and 2006 Form 990. The letter further indicated that the Chapter had a right to appeal to the Executive Committee and that said appeal would result in a hearing. The letter further indicated that the CPC had voted to place the Chapter on probation in the interim.

Equally telling, however, is what Mr. Byar's letter did not indicate. There is no indication as to whether the CPC or the RI Chapter had the burden of proof at the "hearing." Similarly, the letter gave no indication as to which entity had the burden of proof at the former CPC "hearing." There was also no indication as to what the standard would be for the Executive Committee – whether they would be reviewing the CPC's decision "de novo" or would be determining if there was "clear error" on the part of the CPC. Further, there was also no information about the manner in which the hearing would take place, where it would take place, or any indication of the procedural efforts undertaken to establish impartiality.

On April 16, 2008, the RI Chapter filed a written motion requesting an appeal. The RI Chapter also asked that it be allowed to conduct some discovery but was denied that request. On May 7, 2008, the Chapter thereafter filed a Supplemental Memorandum

---

[3] The RI Chapter has been informed that rather than a separate ballot the vote is conducted by seeking an "Ay" response to the motion on the table – which was apparently revocation. During the telephone call, CPC member Frank Rounds asserted that he was a "tax lawyer" and that the RI Chapter committed fraud.

in Support of the Notice of Appeal, as well as four binders of exhibits supporting the RI Chapter's position. The Memorandum outlined the reasons that the RI Chapter had not engaged in any fraud or deception and was accompanied by four notebooks of documents as Exhibits. It included a detailed explanation as to how the Forms 990 were filled out and why the RI Chapter did it that way. The RI Chapter further requested that it be allowed to have some of its members actually appear at the hearing but was told that could not be arranged.

Shortly thereafter, the RI Chapter received two affidavits from representatives of the MAWFA setting forth information concerning their review of the documentation provided by the Chapter. In response, on May 13, 2008, the RI Chapter filed additional evidence and documents to counter the affidavits it had received.

On May 15, 2008 at 5:15 p.m., the RI Chapter's Board of Directors met at their counsel's law office. A telephone conference "hearing" was conducted by Bob Biglar of the MAWFA Executive Committee. The Executive Committee was comprised in part of members of MAWFA's board of directors. The board of directors receives legal guidance from the MAWFA's general counsel, David Mulvihill.

At this "hearing," the RI Chapter was given 20 minutes to present information. The CPC, which was represented by John Rounds, Esq., a MAWFA board member, was also given 20 minutes to present information. There was no examination of any witnesses. Both sides were then given an opportunity for oral summation. Again, there was no indication whether this hearing would be "de novo" or whether it would be to determine if there was any "clear error." There was no indication of the burden of proof or the standards to be imposed. There was no indication as to whether or not a written

decision would be set forth. There was no confirmation from all of the Executive Committee members as to whether they had reviewed the RI Chapter's Memorandum and the Exhibits that accompanied it.

On May 16, 2008 at 4:20 p.m. David Mulvihill, Esq, spoke with the RI Chapter's counsel by telephone, informing him that the Executive Committee voted unanimously to uphold the CPC's revocation. There was no written decision sent to the RI Chapter in advance of his call. Indeed, the specific basis for the revocation still has not been set forth. The RI Chapter was simply told that, by Tuesday, May 20, 2008, two representatives of the MAWFA would be traveling to Cranston, Rhode Island to presumably review books and records in conjunction with the revocation.

On May 19, 2008, with no alternative, the RI Chapter filed a Motion for Temporary Restraining Order in Rhode Island Superior Court. Prior to the hearing, the RI Chapter's counsel consulted with David Mulvihill, Esq. Mr. Mulvihill agreed that he would contact Deborah Thompson, one of the two representatives from the national office on her way to Rhode Island, and inform her not to go to the RI Chapter's office. The Court issued a 10-day restraining order which was scheduled for hearing on May 29, 2008. However, in the afternoon of May 28, 2008, counsel for the MAWFA filed a Notice of Removal. No hearing was conducted. Thereafter, this case was removed to this Court.

The MAWFA's crusade to end the RI Chapter can serve no just purpose and will only serve to harm the children of Rhode Island served by the RI Chapter. At the suggestion of Frank Melucci and with the approval of the MAWFA, the RI Chapter filed amended Form 990s with the IRS on or about February 27, 2008 for 2005 and 2006. To

this day, the IRS has never made an issue of any Form 990 filed by the RI Chapter. A local investigative reporter reviewed the relevant documents and found there to be "no story here." No funds have been embezzled; no donors bilked; no children harmed. In the world of the National Basketball Association, this is a "no harm-no foul" situation.

Despite the absence of any harm, the MAWFA opted to impose the greatest punishment available on the RI Chapter without even considering a lesser sanction. The MAWFA could have required the RI Chapter to be placed on probation and the RI Chapter would have accepted that outcome. In fact, the RI Chapter indicated that it was willing to do whatever was needed to fulfill the MAWFA's request with respect to filling out the Form 990. During the "hearing" the RI Chapter asked for clemency on what it believed to be a purely technical issue. Rather than afford clemency, the Executive Committee simply "rubber-stamped" the CPC's proposed revocation.

The MAWFA has taken the path of least resistance, but the RI Chapter has not. For the MAWFA, this path appears to be to revoke the RI Chapter's charter and assume control of all of the money raised by the Chapter. This approach is consistent with the MAWFA's modus operandi over the past several years. The RI Chapter is not in the position to be quite so sanguine in light of the MAWFA's proposal. The MAWFA's course of action flies in the face of fundamental fairness. The RI Chapter's very existence hangs in the balance.

## IV. APPLICABLE STANDARD

The standard for review of a preliminary injunction requires this Court to make a determination that the party seeking such relief can establish: first, there is a likelihood of success on the merits of the underlying complaint; second, that irreparable harm will

result if the injunctive relief is not granted; third, that the balance of the equities in the public interest is served by the injunctive relief and; fourth, that the status quo between the parties will most likely be maintained by the injunctive relief ought. *See*, *King v. Grand Chapter of Rhode Island Order of Eastern Star*, 919 A. 2d 991 (R.I. 2007). As set forth below, the RI Chapter has the right to arbitration and is able to demonstrate that all of the aforementioned factors run in its favor.

## V. <u>ARGUMENT</u>

### A. <u>The RI Chapter Has the Right to Arbitration Under the Chapter Agreement</u>

The "Chapter Agreement" drafted by the MAWFA sets forth the following information which establishes the relationship of the parties, discipline and the right to appropriate review:

> *9.* *<u>Relationship of Parties</u> – Foundation and Chapter are not . . . joint venturers, partners or agents of each other . . . . Neither Foundation nor Chapter shall suffer any liability to any person or entity incurred or arising out of any acts of the other. . . .*

Therefore, there is no indication that the RI Chapter is so intertwined with the MAWFA that its very existence is at the pleasure of MAWFA as its ownership group. In fact, this section establishes that one entity is not responsible for the acts of the other. Thus, any legal cause of action that may exist against the RI Chapter would not implicate the MAWFA.

Section 11 addresses chapter discipline:

> *11.* *<u>Chapter Discipline</u>*
>
> *"<u>If</u> Chapter is in breach of its obligations under this Agreement, Foundation's Bylaws or the Policies . . . the Chapter Performance Committee shall have the power to . . . impose revocation. . . ." (Emphasis added.)*

This section predicates the imposition of revocation first and only on a determination that the Chapter has breached an obligation under the Agreement. The *sine qua non* of imposing revocation is an actual breach. Although the MAWFA tries to rationalize a breach, none exists. Neither the IRS nor any other governmental agency has alleged any violation of law. Thus, the "breach" is only what the MAWFA now claims to be the way the RI Chapter filled out the forms (now characterized as deceptive or fraudulent despite the fact that this very issue was discussed with Steve Hunt, the national internal auditor of the MAWFA two years ago).

Section 14 sets forth certain aspects of revocation:

> *14.* *<u>Revocation</u>*
>
> *14.1 –Upon Revocation, all rights and privileges of Chapter shall immediately terminate.*
> *14.2 . . .*
> *(d) Deliver books and records to Foundation*
> *(e) Remove name or reference to "Make-A-Wish"*
> *(f) Furnish Foundation with an accounting*
> *(g) Transfer . . . such of its assets*
>
> *14.4 – Upon Revocation, Chapter covenants and agrees that it shall not engage in the Foundation's Purpose or any purpose which involves the granting of wishes to sick children within the Territory for a period of two calendar years from the date of Revocation.*

Although the MAWFA sets out a course of revocation, it follows it up by including Section 14.4, which is a non-compete agreement. Therefore, despite the fact that the express mission of the MAWFA and the RI Chapter is "God's work" – to fulfill the wishes of oftentimes dying children – the MAWFA wants to ensure that it can revoke the existence of a local chapter and then mandate that for two years none of the people who comprised the Chapter may work to grant wishes to dying children of that territory. This takes non-compete agreements, which have never been favored in this state or many

others, to an entirely new level. What literally comes to mind is the adage about "throwing the baby out with the bath water." This provision highlights the MAWFA's desire to consolidate power and authority. On its face, Section 14.4 indicates that MAWFA does not want any competition in the arena of granting dying children's wishes, particularly by uncompensated members of a local chapter's board of directors, even after the MAWFA unilaterally put an end to the existence of that very chapter.

Section 15 sets forth some of the elements of the Chapter Action Meeting as follows:

> *15. Chapter Action Meeting*
>
> *If a written statement has been timely filed, Chapter may also appear at the Chapter Action Meeting. (Emphasis added.)*

Although the word "appear" is specifically utilized by the MAWFA, no "appearance" was provided to the RI Chapter by the CPC.

Two sections later, the Chapter Agreement addresses the administrative appeal or remedy which is available:

> *17. Appeal*
>
> *17.2 "Hearing shall be conducted within 30 days after the written notice of appeal is received." "At the hearing, a representative of the CPC and the Chapter shall have the right to present evidence either in writing or by appearance, or both." (Emphasis added.)*

Once again, the word "appearance" is specifically utilized by the MAWFA. However, when the RI Chapter sought to actually have its board members appear before the Committee, as the plain language indicates, the RI Chapter was told this could not be done. Although the very existence of the RI Chapter hung in the balance, no actual

"appearance" was provided to the RI Chapter by either the CPC or the Executive Committee.

The administrative remedy ends with the appeal to the Executive Committee as noted:

> *17.3 "The decision of Executive Committee on the appeal shall be final and unappealable."*

Section 17 is a subsection of the provision pertaining to "Appeal." It articulates an appeal as an administrative remedy in light of Probation, Inactive Status, Revocation or an involuntary change to its name, Territory or Headquarters location. Section 17.3 simply indicates that there is no further administrative remedy after the Executive Committee has rendered a decision. In order to even avail oneself of a potential remedy by a neutral fact-finder - in this case arbitration - all administrative remedies must be exhausted. The RI Chapter has done so.

Thereafter, the Agreement focuses on arbitration as follows:

*21. <u>Arbitration</u>*

> *21.1. Except as provided in Section 21.3, all disputes arising in connection with this Agreement or otherwise between Chapter and Foundation . . . shall be finally settled by binding Arbitration.*

After this section carves out an exception for "Extraordinary Relief" under Section 21.3 (which addresses seeking a temporary restraining order or preliminary injunction), it states that <u>all</u> disputes between the Chapter and Foundation <u>shall</u> be <u>finally</u> settled by binding arbitration. If the MAWFA wanted to carve out chapter discipline disputes from arbitration it simply could have written: "Chapter discipline issues are <u>not</u> arbitrable." Instead, it simply carves out section 21.3 concerning extraordinary relief. In fact, the MAWFA included the phrase "all disputes" as opposed to "limited disputes" or

"selective disputes" or even "non-disciplinary disputes." Moreover, by using the word "shall" as opposed to "may" the MAWFA mandates the settlement of all disputes by arbitration. This point is further clarified by the last phrase "shall be finally settled by binding arbitration." This only makes sense after a chapter has exhausted its internal, administrative remedy.

The next section of the Agreement furthers the prior point as follows:

> *21.2. All disputes between Foundation and Chapter regarding chapter discipline shall be governed exclusively by and within the rules established in this Agreement, Foundation's Bylaws and the Policies. . . . Foundation may, in circumstances requiring Extraordinary Relief (as defined below), enforce such result by bringing an action in state court in the state in which the headquarters of Foundation is then located, or in the United States District Court for such state and area.*

Naturally, if Section 21.2 states what the MAWFA wants this Court to believe it says it would read: **"There is no right to arbitration concerning any internal disciplinary issue."** Having not said anything that plain and simple, this section reiterates that chapter discipline actions must go through the administrative procedure outlined in Sections 11, 14 and 17. Plaintiff has gone through this process.

Nowhere in the Chapter Agreement does it specify that disputes concerning Chapter discipline are excluded from the arbitration process. Such an unconscionable limitation would stand in stark contrast to the next two sentences of this provision which allow that Foundation to seek extraordinary relief to enforce its determination. Thus, the MAWFA can seek arbitration and even judicial relief, but the RI Chapter cannot? Either the MAWFA is trying to convince this Court to enforce a one-sided contract of adhesion that only affords relief to the Foundation and not to any local chapter, or this is not a one-

sided contract of adhesion and it allows the RI Chapter to seek arbitration concerning the most significant issue about which it could be confronted – its very existence.

**B. Judicial Review is Appropriate Because the MAWFA's Decision to Revoke the RI Chapter's Status Was Arbitrary and Capricious and Violates Principles of Natural Justice**

While the MAWFA tries to dissuade this Court from undertaking even a cursory analysis of the RI Chapter's claims, the very authorities upon which the MAWFA relies support the case for judicial review. In the first instance, the cases upon which the MAWFA relies are distinguishable on the basis that they involved private organizations, some or all of which were unincorporated. *See*, *King*, 919 A.2d at 993 (unincorporated private organization); *Gorman v. St. Raphael Academy*, 853 A.2d 28, 30 (R.I. 2004) (private school); *Rowland v. Union Hills Country Club*, 157 Ariz. 301, 757 P.2d 105 (Ariz. Ct. App. 1988) (country club). In contrast, the dispute between the MAWFA and the RI Chapter is more akin to that between a franchisor and franchisee than between a voluntary association and its members. The RI Chapter is a separately incorporated entity that files its own tax returns. In addition, Section 9 of the Chapter Agreement makes clear that the MAWFA and the Chapter are not joint venturers, partners, or agents of one another and that neither one can subject the other to liability.

Courts have not hesitated to take a "hard look" at contracts when the type of business relationship at issue in this case is involved. *See In Re Bath Junkie Franchise, Inc.,* 246 S.W.3d 356 (Tex. App. 2008) (analyzing validity of arbitration clause in franchise agreement); *Independent Association of Mailbox Center Owners, Inc. v. Superior Court*, 34 Cal. Rptr. 3d 659 (Cal. Ct. App. 2005) (ordering certain provisions of franchise agreement arbitration clause to be stricken as unconscionable); *Barter*

*Exchange, Inc. of Chicago v. Barter Exchange, Inc.*, 606 N.E.2d 186 (Ill. App. Ct. 1992) (evaluating right to arbitration under franchise agreement and state law).

Even in matters involving an unincorporated organization, a court will intervene if the organization's enforcement of its rules is "arbitrary and capricious" or constitutes an abuse of discretion. *King*, 919 A.2d at 997 (citing *Hebert v. Ventetuolo*, 480 A.2d 403, 407 (R.I. 1984))). *Accord*, *Rowland*, 157 Ariz. At 305, 757 P.2d at 109 (judicial review is available where an action violates "the organization's by-laws or was in bad faith, fundamentally unfair, fraudulent or utterly unsupported by any evidence."). The initial deference usually accorded to such private organizations is premised upon the organization having rules that are reasonable and do not violate public policy. *King*, 919 A.2d at 996 (citing *Gorman*, 853 A.2d at 37). However, where an organization's rules are not reasonable or are applied in an "arbitrary and capricious" manner by an organization's officers, "there is wisdom in providing a judicial remedy" to persons aggrieved. *Id*. at 998.

In addition, judicial review of a voluntary association's disciplinary action is available if the action violated the organization's own rules or "involved some basic procedural unfairness, such as denial of notice or opportunity to defend." 6 Am. Jur. 2d *Associations* § 37. While such organizations are not required to conform to procedures in the nature of those in a court of law, "[a] violation of the principles of natural justice in the proceedings is a basis for resort to the courts." 6 Am. Jur. 2d *Associations* § 36. As detailed above and below, the process by which the MAWFA revoked the RI Chapter's status was arbitrary and capricious, violated the Chapter Agreement and violated

fundamental notions of due process and natural justice. Therefore, judicial review in this case is both necessary and appropriate.

**C. The MAWFA Breached the Plain Language of the Chapter Agreement By Denying the RI Chapter the Right to Appear in Person**

The RI Chapter states a claim for relief because the MAWFA has breached its contract. The MAWFA breached the Chapter Agreement by repeatedly denying the RI Chapter the right to appear and defend itself against the impending revocation. Section 15, entitled "Chapter Action Meeting," states that the chapter may "appear at the Chapter Action Meeting." (emphasis added). The RI Chapter asked to exercise its right to appear before the CPC. However, the RI Chapter was never permitted to appear as it had requested.

Similarly, the RI Chapter was denied the right to appear in person before the Executive Committee. Section 17.2 of the Chapter Agreement under the heading of "Appeal" indicates that the RI Chapter had "the right to present evidence, either in writing or by appearance or both . . . ." (emphasis added.) Once again, when it asked to appear, the RI Chapter was told this could not be arranged.

The plain meaning of "appear" is to "to be or come in to sight." *Merriam-Webster Online Dictionary* (2008). Therefore, the RI Chapter had a contractual right to "appear" in person before its accusers on the CPC and the Executive Committee to defend itself. However, the MAWFA denied the RI Chapter that right on two occasions and thereby breached the plain language of the Chapter Agreement.

**D. The MAWFA Breached Its Duty of Good Faith and Fair Dealing to the RI Chapter**

The MAWFA also breached its contract with the RI Chapter by subjecting it to a disciplinary process that was not neutral, impartial or in accordance with its contractual obligations of good faith and fair dealing. *A.A.A. Pool Service & Supply, Inc. v. Aetna Casualty & Surety Co.*, 395 A.2d 724 (R.I. 1978) (parties to a contract have an implied duty to deal fairly with one another); *Nolan v. Starlight Pines Homeowners Association*, 216 Ariz. 482, 488-89, 167 P.3d 1277, 1283-84 (Ariz. Ct. App. 2007) (same). A party breaches its implied duty of good faith and fair dealing if it denies the other party the reasonably expected benefits of their agreement. *Id*. at 489, 167 P.3d at 1284.

The MAWFA breached the obligation of good faith and fair dealing that it owed the RI Chapter by foreclosing the RI Chapter from any meaningful opportunity to present its case. As set forth above, the RI Chapter was not allowed "appear" in person before either the CPC or the Executive Committee. Due process requires that a party have the opportunity to be heard "at a meaningful time and in a meaningful manner." *Larue v. Registrar of Motor Vehicles, Department of Transportation, Office of Operator Control*, 568 A.2d 755, 758 (R.I. 1990) (quoting *Millett v. Hoisting Engineers' License Division of Department of Labor*, 377 A.2d 229, 235-36 (1977)). The "meaningful manner" requirement means that a party must have a reasonable opportunity to exercise a right. *Id*. at 758. The RI Chapter was afforded no opportunity to present its case to the CPC by telephone. This, in itself, rendered its right to "appear" virtually meaningless. Similarly, the availability of a "hearing" under Section 17 of the Chapter Agreement was a hollow right. The "hearing" was also conducted over the phone such that the RI Chapter was constrained in its ability to present evidence and examine witnesses.

The RI Chapter was also denied the most fundamental right to have its fate determined by a fair and impartial decision maker. A fair trial is a basic requirement of due process. *Withrow v. Larkin*, 421 U.S. 35, 46 (1975) (citing *In re Murchison*, 349 U.S. 133, 136 (1955)). To that end, the concept of due process requires those who serve in judicial or quasi-judicial capacities to be impartial. *Schweiker v. McClure*, 456 U.S. 188, 195 (1982). It is not only actual impartiality that is important, but also the appearance of impartiality. As the U.S. Supreme Court stated in *Murchison*, "our system of law has always endeavored to prevent even the probability of unfairness." 349 U.S. at 136. Therefore, "to perform its high function in the best way, justice must satisfy the appearance of justice." *Offutt v. United States*, 348 U.S. 11, 14 (1954).

While there is a presumption of honesty and integrity accorded to decision makers, and the mere combination of functions within a body does not establish a *per se* violation of due process, there are situations in which "under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." *Withrow*, 421 U.S. at 47-48; *La Petite Auberge, Inc. v. Rhode Island Commission for Human Rights*, 419 A.2d 274, 284 (R.I. 1980). As a result, there may be facts or circumstances in a particular case that pose an intolerably high risk of unfairness such that due process concerns are triggered. *Id*. at 58. Indeed, due process is a flexible concept that "calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Therefore, the combination of investigative powers and judicial powers in one body is suspect.

Even more egregious is the overlapping of prosecutorial and decision making functions. Due process precludes those who serve in a prosecutorial capacity from serving as the ultimate decision makers. *Davis v. Wood*, 427 A.2d 332, 337 (R.I. 1981). The reason behind the prohibition is that one who has taken one side of an issue will be deemed unable to judge the matter later in a dispassionate manner. *Id*.

The MAWFA claims that the Chapter Agreement "provides for the imposition of discipline by the <u>impartial</u> CPC and an appeal to the <u>impartial</u> Executive Committee." If only it were so. By all appearances, there is a substantial likelihood that the Executive Committee was biased and that its decision was tainted by the CPC because the line between the CPC and the Executive Committee is a blurred one. In this case, the CPC was acting in an investigative capacity, if not a prosecutorial one, at the Chapter Action Meeting that was held on March 12, 2008. At that "meeting," the CPC asked RI Chapter Board representatives a series of questions about the alleged improprieties. In doing so, the CPC was arguably gathering evidence in a prosecutorial role to advance its plan to revoke the RI Chapter's charter. However, at a minimum, the CPC was acting as an investigatory arm for the MAWFA.

Subsequently, on May 15, 2008, the Executive Committee held a "hearing" by phone. However, the "hearing" was not the type of independent review and adjudication contemplated by due process. Indeed, the proceedings appear to have been far from impartial. Some members of the CPC were present at least by phone, and possibly in person. In fact, the CPC's role at the "hearing" was akin to that of a prosecutor in that the CPC was advocating for its prior decision to revoke the RI Chapter's status.

The extent to which the CPC communicated with the purportedly impartial Executive Committee members either before or during the "hearing" remains unknown. By the MAWFA's own admissions, Board members sit on both bodies. Upon information and belief at least one Board member may sit on both bodies. While such a dual capacity member may not have voted with the Executive Committee, there is a real and substantial danger that this individual or other members of the CPC shared information gained through the CPC chapter action meeting with the Executive Committee prior to the "hearing." Because of the real risk that investigative and prosecutorial functions of the CPC tainted the impartiality of the Executive Committee, the RI Chapter cannot reasonably be said to have received a fair hearing.

What little process the RI Chapter received was entirely one-sided. Section 15 of the Chapter Agreement gives sole and unlimited discretion to the CPC to limit the time for and set the procedures for the RI Chapter's appearance at the Chapter Action Meeting. In this case, the RI Chapter was not allowed to present its case in any manner. Therefore, the RI Chapter was denied the opportunity to be heard in a reasonable manner.

The RI Chapter was further prejudiced in its ability to defend itself because it had no notice regarding the applicable burden of proof. Section 17 of the Chapter Agreement offers a chapter no insight into the manner in which hearings are conducted. It merely provides that both the chapter and the CPC can "present evidence" that will be considered by the Executive Committee. See Chapter Agreement at § 17.2. Indeed, the RI Chapter went into the "hearing" without even having the benefit of knowing whether it had the initial burden of proof. One need not strain to conclude that a "hearing" can scarcely be

deemed to have been fair when only one party knows the rules by which it is going to be conducted.

As if the "hearing" process itself was not fundamentally deficient, the outcome was even more egregious. To date, the RI Chapter has been well-apprised of the MAWFA's decision to revoke, but has not been provided with any information about how that decision was reached, what evidence (if any) the MAWFA relied upon or the ultimate basis or bases for the MAWFA's decision. Indeed, as the MAWFA did not present any "evidence" at the "hearing," one can only guess at the rationale for the final decision. The Executive Committee never issued a written decision or otherwise informed the RI Chapter of the reasons for its decision to uphold the revocation. The absence of such a decision is particularly troubling in light of the fact that the MAWFA never disproved the RI Chapter's claims. Therefore, the process used by the MAWFA to revoke the RI Chapter's status violated the Chapter Agreement, fundamental notions of due process and the duty of good faith and fair dealing owed to the RI Chapter.

**E. The RI Chapter Has Established Each of the Four Factors Necessary for Injunctive Relief.**

1. Likelihood of Success on the Merits

More than two years ago, the RI Chapter sought a safe harbor by inquiring whether or not it needed to provide the compensation of its C.E.O. in a specific place or whether all employment compensation could be aggregated on line 26 of the Form 990. When it consulted the MAWFA, Steve Hunt never told the RI Chapter that it could not fill out the form as it did. He simply told the Chapter to look at examples of other chapter filings, two of which were filled out like the RI Chapter. Now, however, the MAWFA takes great pains to explain that the "IRS produces articles on various issues affecting

exempt organizations which are published annually as part of its Exempt Organizations Continuing Professional Education Technical Instruction Program ("EO CPE Text")." (See Defendant's Footnote 9.) Query why something the MAWFA believes was so widely known in 2005 apparently was unknown to the MAWFA's own representative, Steve Hunt, when a local chapter specifically inquired about it. Rather than directing the RI Chapter to the "EO CPE Text," Mr. Hunt told Dr. Hackney to review other chapter's filings.

The RI Chapter did as it was directed and reviewed other chapters' Forms 990. It noted that there was inconsistency in the way they were filed. It noted that different Chapters used different schedules to articulate the information apparently being sought. As previously indicated, the RI Chapter is aware that other Make-A-Wish chapters, including Oklahoma and Vermont, in 2004 and 2005 respectively, filled out their Form 990 in the same way the RI Chapter did. (See **Exhibit 1 and Exhibit 2**). However, these chapters have not been revoked and the Executive Committee even conceded that the MAWFA was aware of such filings. This is expressly why Courts have the obligation to intercede in disciplinary proceedings. Our system of justice cannot and should not countenance decisions which are plainly arbitrary and capricious. What can be any more arbitrary and capricious than revocation for one and not the other (neither of which warrant revocation)?

In addition, the RI Chapter provided all of this information to Grant Thornton, the MAWFA's national accounting firm. Grant Thornton never made an issue of the way the Form 990s were completed. The RI Chapter also asked its own accountant about the

propriety of filling out the form as it did. The accountant signed the form as its preparer and believed that it had comported with all of the necessary requirements.

By virtue of seeking advice from Steve Hunt of the MAWFA, and by virtue or providing copies of the Forms 990 to the MAWFA, the Foundation was or should have been aware of the position that the Chapter took two years earlier. Based on the similar way other chapters filled out their Form 990s, the MAWFA appears to have a history of ignoring the disparities or discrepancies between of other chapters. It highlights a revocation decision which appears arbitrary and capricious. In fact, a review of the Form 990 filed by more than 20 different chapters shows that five (5) chapters completed these forms in a manner similar to Rhode Island, and at least six (6) others did not include the CEO's salary in line 25. Yet, it is the RI Chapter, and apparently only the RI Chapter, which awaits the gallows.

In his affidavit attached to the MAWFA's brief, David Mulvihill insinuates that Dr. Hackney provided testimony inconsistent with her affidavit at the administrative "hearings." Nothing can be further from the truth. Dr. Hackney's sworn affidavit is attached as **Exhibit C**. The affidavit of accountant Frank Melucci is attached as **Exhibit D**. The affidavit of the RI Chapter's Chairman of the Board of Directors, Mary Lou Schoettler is also attached as **Exhibit E.**

Dr. Hackney affirms in paragraph 10 of her affidavit that,at the time the subject Forms 990 were filled out, she believed in good faith that each return was filed in compliance with all applicable Internal Revenue Service Rules and Regulations. Additionally, she affirms that she had no reason to believe the national organization objected to the information reflected in the returns. Despite being advised by a

representative of the MAWFA national office to explain that her failure to include her salary was simply an oversight, Dr. Hackney has consistently said that such an excuse would be inaccurate. The RI Chapter and Dr. Hackney believed they were filling out the form appropriately. There was no intent to deceive. There was no intent to defraud. The reason that the RI Chapter believed it was acceptable was because Dr. Hackney's salary, as well as all of salaries paid by the RI Chapter, were listed on line 26. Dr. Hackney was simply trying to determine if it had to be segregated out individually in line 25.

There is a huge difference between the intent to perform an act and the intent to perform an act that one knows to be fraudulent, unethical or a crime. Dr. Hackney conceded from the very beginning that there was an intent to fill out the form as was done. However, that intent was never predicated on an iota of information which indicated that was an incorrect filing.

The RI Chapter's position is supported by Mary Lou Schoettler's affidavit at paragraph 4. (See **Exhibit E**). She states "I am unaware of any effort to defraud the Federal Government or any other institution or person with respect to the manner in which this Chapter filled out the Form 990s." This same sentiment is echoed by Frank Melucci, CPA, at paragraph 2 of his affidavit (See **Exhibit D**) when he claims "at the time the returns were prepared, I believe that each return had been prepared in accordance with, and satisfied in all other material respects, all applicable Internal Revenue Service Rules and Regulations and had no reason to believe that the Make-A-Wish Foundation of America objected to any of the positions reflected on the returns."

To justify a unanimous vote to revoke and eliminate the RI Chapter, every member of the MAWFA's CPC and Executive Committee must have presumed there was

a master plan to defraud or deceive. This is not true, has never been true, is unsupported by even a shred of evidence and is a fundamental fulcrum of the RI Chapter's position why the revocation is inconsistent with the action undertaken.

The MAWFA's memorandum also makes much about the motivation and objectives of the IRS, apparently unimpressed by the fact that IRS itself has not made the RI Chapter's forms an issue. The MAWFA not only wants to act as its own prosecutor, judge and jury, it also seeks to act in this very role for the IRS. And because the RI Chapter and the MAWFA are separate entities, not liable for the actions of each other, the MAWFA faces no jeopardy. In the end, no money was siphoned, no child's wish was undermined, no donor was bilked. The entire controversy revolves around a technicality in filing and is a controversy stirred by the MAWFA, as a pretext for Chapter consolidation.

The RI Chapter is simply seeking an impartial and objective observer to review all the facts and determine if the actions it undertook in any way merit the revocation and ultimate death sentence of this organization.

2. Irreparable Harm

The irreparable harm by revoking the Chapter is obvious - the death penalty for the RI Chapter. There can be no greater circumstance of irreparable harm than allowing a unilateral decision to end the existence of an individual or an entity, particularly where there has been no form of fair and impartial hearing in which the fundamental tenants of due process have been provided. The harm is not merely to the RI Chapter as an entity, but directly impacts its people who have worked so tirelessly for the cause. The members of the RI Chapter's board of directors are not compensated for their work and most of

these members were not on the board in 2005. Nevertheless, they willingly dedicate their time to raise money to help fulfill the wishes of seriously ill children from Rhode Island.

The harm to the children of Rhode Island will also be irreparable. The RI Chapter desperately wants to continue to serve the seriously ill children of Rhode Island. However, terminating the RI Chapter will directly and unequivocally impact the personal and local services to these seriously ill children of Rhode Island.

3. Balancing of the Equities in Public Interest

Generally speaking, when a death sentence is invoked, it is as a result of some unconscionable action. It is, in fact, the most egregious form of punishment known to this society. In balancing the equities, it is hard to imagine in any sense that the technical way the RI Chapter filled out its Form 990 for 2005 and 2006 justifies imposing the ultimate penalty and ending its existence.

The severity of the punishment proposed by the MAWFA far outweighs the alleged harm. Indeed, there is not a shred of evidence that any harm has resulted. The RI Chapter's forms that were filed provided the public with total compensation of all of its workers, including the C.E.O.'s salary. Moreover, aside form the MAWFA, nobody else seems to be interested: not a local R.I. investigative reporter whose job it is to find a story; not even the IRS, whose very existence is predicated on making determinations as to whether tax returns are appropriately filed. The only party that wants to make this situation into a story is the MAWFA and that is because the backstory – in fact, the real story - is that this segues into the MAWFA's ongoing policy of chapter asset consolidation. There is no balance of equities if the MAWFA gets to make decisions that

are inconsistent with its Chapter Agreement, and make them without the appropriate checks and balances.

The public interest is best served, and only served in this case, by allowing the RI Chapter to continue. The Rhode Island Chapter has received and will continue to receive significant donations by Rhode Island benefactors, both individuals and businesses, for the express benefit of the sick children of Rhode Island. None of those donations were made with the belief that the donations would be consolidated and controlled either by the National Foundation or by a chapter in an adjoining state. In addition, there are contingent gifts in wills that will mature. These relationships and subsequent gifts were developed specifically by Rhode Island people, through Rhode Island people, for Rhode Island's young people. There is also the possibility of negative publicity for both the RI Chapter and the MAWFA National Office. This is publicity which easily could be avoided if the MAWFA simply allows an arbitrator, pursuant to Section 23 of the Chapter Agreement, to review the facts and make an objective determination.

The RI Chapter wants to live to continue in its mission - serving RI children. None of the members of the RI board of directors has any personal gain in this fight. However, they cannot be steamrolled when there is no objective evidence to support such a Draconian decision.

Not only will the injunction not adversely affect the public interest and policy considerations, the failure to enjoin the MAWFA will be deleterious to the Rhode Island public that benefits from this Chapter's local work. By statute, both the Attorney General's office and the Superior Court have to consent to the liquidation of a charitable

trust. The RI Chapter, under the statute and in the view of the Attorney General, is a charitable trust. The MAWFA cannot act unilaterally.

There are other public policy considerations based on the documents that form the agreement between the MAWFA and the RI Chapter. The administrative remedy in the Chapter Agreement allows for an "appearance" but the RI Chapter was told that they only could appear by a telephone call. It seems that the CPC and the Executive Committee are far more comfortable mandating the execution of a chapter when they do not need to be confronted by any of the members whose chapter they are revoking. The CPC issued a revocation without asking for the Rhode Island Chapter to even provide a defense. The CPC acted as the investigative body; it did not elicit the Chapter's position; and after obtaining answers to its investigatory questions, made a determination consistent with the position that it was seeking to bolster.

The Chapter Agreement is also fundamentally an agreement of adhesion. All of the power, at least in terms of arbitration and seeking court's intercession, lies exclusively with the MAWFA. The Chapter Agreement tried to eliminate any opportunity for a local chapter to engage in court's intercession.

4. Maintaining the Status Quo Between the Parties

Finally, by granting the injunctive relief sought by the RI Chapter, the status quo between the parties will be maintained. The RI Chapter will continue to engage in its charitable activities to the benefit of the seriously sick children of Rhode Island. The RI Chapter will continue to follow the MAWFA's regulations. All this will continue as it has in the past until the RI Chapter has been provided a fair and impartial hearing before

a neutral fact-finder, under the rules promulgated by the American Arbitration Association to determine if its actions warrant the termination of its existence.

**F. The MAWFA Has Already Violated the Temporary Restraining Order**

On May, 20, 2008 Superior Court Judge Judith Savage executed a Restraining Order containing the following provision:

> *. . .A hearing having been set for May 29, 2008 at 2:00 p.m., in the interim, this Court orders Defendant to refrain from taking any measures to revoke, consolidate, merge or assume ultimate control over the Rhode Island Chapter.*

Although the MAWFA may not like the fact that a Temporary Retraining Order exists, it cannot violate that Order. Nevertheless, it has already done so.

As part of its affiliation with the MAWFA, the RI Chapter receives funds that it raises in-state through RI residents in conjunction with certain national events. By way of example only, there is a BMW event in which the RI Chapter would receive funds based on the vehicles sold at INSKIP in Warwick, Rhode Island. The contract that the MAWFA national office has with a dealership like INSKIP specifies that the money raised will go to the state where the dealership is located. The RI Chapter helps promote these type events in state and works for these specific funds. Under the online listing, local donors request that the funds raised go to the RI chapter. It is the donors' intent that the funds are so directed.

These specific funds are then tracked and calculated by the MAWFA national office. The MAWFA receives a percentage of the funds raised as an offset to the purported administration they undertake. Thereafter, the amount raised by each local chapter is supposed to be sent to the local chapter, as well as a listing of the accruals.

Not only did the MAWFA fail to send the accrual listing and check to the RI Chapter for the May distribution (which would have been received in the last week of May), but the MAWFA has provided no accounting of the money it was supposed to disburse to the RI Chapter. In short, the MAWFA disregarded the express donors' intent for these funds and has already started to consolidate or redistribute assets that are RI assets. Moreover, Dr. Hackney's name has been removed from the distribution list.

The Order executed by Judge Savage states: ". . . *refrain from taking any measures to revoke, consolidate, merge or <u>assume</u> ultimate <u>control</u> over the Rhode Island Chapter…*" (Emphasis added). The MAWFA has violated this Order by retaining, consolidating, redistributing and/or controlling funds raised by RI donors expressly for RI children. This violation must cease and the MAWFA should be ordered to provide the donations and an accounting for May and every month thereafter until an arbitrator has reached a decision n this matter.

## VI. <u>CONCLUSION</u>

The RI Chapter respectfully requests this Court deny the MAWFA's Motion to Lift the Stay and grant the RI Chapter's Motion for Preliminary Injunction in order to enjoin the MAWFA from taking any of the measures to revoke the Chapter, or to gain access to the books, records or funds of the RI Chapter until such time as an arbitrator, employing the rules of the American Arbitration Association, makes a determination in this matter. The RI Chapter also asks that the MAWFA be enjoined from retaining funds that have been raised by the RI Chapter and are due to the RI Chapter as articulated in Section F above. Additionally, the Rhode Island Chapter seeks to continue its charitable mission until an arbitrator fully reviews all the evidence and a decision is forthwith.

Finally, the RI Chapter seeks to be allowed to allocate the necessary funds to defend itself in this arbitration process.

For the Plaintiff's
By its counsel

/s/ Todd D. White, Esq.
TODD D. WHITE #5943
VICTORIA M. ALMEIDA #1755
E. HANS LUNDSTEN #1156
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
T: (401) 274-7200
F: (401) 351-4607
Dated: June 16, 2008

**CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of June 2008, I electronically filed the attached document with the Court using the ECF system. The following counsel of record are registered with the Court and will be served electronically through the ECF system:

State of Rhode Island
Patrick C. Lynch, Esq.
Office of the Attorney General
150 South Main Street
Providence, RI 02903

Carol E. Head, Esq.
Bingham, McCutchen, LLP
One Federal Street
Boston, MA 02110

/s/ Todd D. White, Esq.

*456372_1.doc*