UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| MAKE-A-WISH FOUNDATION OF RHODE ISLAND, INC., Plaintiff, v. MAKE-A-WISH FOUNDATION OF AMERICA, Defendant. | CIVIL ACTION NO. 1:08-cv-206-S |

**REPLY BRIEF OF DEFENDANT MAKE-A-WISH FOUNDATION OF AMERICA**

Defendant Make-A-Wish Foundation of America ("MAWFA") submits this reply brief in further support of its Motion to Lift Temporary Stay and in Opposition to the Motion for Preliminary Injunction by plaintiff Make-A-Wish Foundation of Rhode Island (the "Chapter").

**PRELIMINARY STATEMENT**

MAWFA fully intends to ensure that eligible children in Rhode Island will continue to have their wishes granted and that donations will be used in accordance with donors' intent. The Chapter's allegations to the contrary are unsupported by record evidence and are without merit.

The fundamental principle the Chapter fails to apprehend is that MAWFA has not only the legal right, but also the fiduciary duty to protect the Foundation's most priceless assets -- the Make-A-Wish Marks and the considerable goodwill associated therewith -- for the benefit of Make-A-Wish chapters throughout the United States and all of the special and courageous children the organization is privileged to serve.

One of the ways MAWFA fulfills its fiduciary responsibility is to ensure that all Make-A-Wish chapters conduct their operations in a manner that complies with applicable law and comports with principles of sound nonprofit management and governance. To that end, chapters are legally bound to comply with various obligations set forth in the Chapter Agreement and in performance standards promulgated by MAWFA from time to time.

When it appears a chapter has failed to live up to its obligations, the Chapter Agreement provides for a discipline process that affords more than reasonable due process. The initial determination as to whether a chapter has violated its obligations (and, if so, what action is appropriate) is made by a group of Make-A-Wish representatives from across the country who volunteer to serve on the Chapter Performance Committee ("CPC"). If a chapter disagrees with the CPC's decision, it has the right to appeal and to present its case at a second hearing before MAWFA's Executive Committee, which is also comprised of Make-A-Wish volunteers. By design, the Executive Committee's decision on appeal is "final and unappealable."

As is described more fully in the Declaration of David B. Mulvihill and the exhibits attached thereto, the discipline process set forth in the Chapter Agreement was followed to the letter in this case. The Chapter was afforded, and took full advantage of, the opportunity to submit written information and present its position on two occasions before two separate committees, both of which ultimately determined the Chapter breached its obligations to an extent that revocation was fully warranted under the circumstances.

The fact that the Chapter does not like the outcome does not mean it can now proceed to arbitration and/or litigation in further violation of the Chapter Agreement. Nor should the Chapter be allowed to further delay the implementation of the revocation decision.

**RESPONSE TO CHAPTER'S ARGUMENTS**

MAWFA relies on the arguments made in its Memorandum of Law in Support of Motion to Lift Temporary Restraining Order and In Opposition to Motion for Preliminary Injunction, and submits this Reply Brief in response to issues raised in the Chapter's Opposition Brief.

Stripped of rhetoric and hyperbole, the Chapter's arguments are unsupported by the facts -- or by any citation to affidavits, declarations, or other record evidence -- and are wholly without merit, as is the Chapter's accusation that MAWFA has violated the terms of the Temporary Restraining Order the Chapter obtained on May 20, 2008.

**1. The Chapter Breached Its Obligations by Intentionally Filing IRS Form 990s that It Knew Were Inaccurate and Incomplete.**

The Chapter now claims there was no "actual breach" of any obligation under the Chapter Agreement -- and, therefore, no basis for imposing revocation -- because "[n]either the IRS nor any other governmental agency has alleged any violation of law" (p.14). This is like an employee who is caught engaged in wrongdoing arguing he cannot be fired because no law enforcement agency has yet to charge him with any crime.

As explained in MAWFA's opening brief (pp. 6-8, 14-17), when it appeared before the CPC and the Executive Committee, the Chapter admitted that it deliberately failed to report the compensation paid to its President & CEO on its IRS Form 990s.[1] In its written statement to the CPC, the Chapter explained it omitted the information, required by law to be disclosed, because another organization was citing the amount of the President & CEO's compensation to discourage potential Make-A-Wish donors. Describing its "error in judgment," the Chapter said:

> It is accurate that the President and CEO's salary was not listed on the actual Form 990s. It was brought to the chapter's attention that during the time period in question that the chapter's previous President and CEO had been advising several past and potential donors of [the current President & CEO] Dr. Hackney's salary. As a result, the form was prepared and filed without the salary for the two years in question. [The salary amount] had appeared in the previous years ....

Mulvihill Decl., Ex. H at pp. 2-3 (Statement of Chapter to CPC).

MAWFA had ample reason to revoke the Chapter's charter and to terminate the Chapter's right to use the Make-A-Wish Marks in its territory -- including not only the Chapter's intentional failure to disclose the President & CEO's compensation on the IRS Form 990s, but also the Chapter's improper dissemination of confidential information about the minor children for whom it had granted wishes.[2]

---

[1] In its brief, the Chapter references conversations it allegedly had with Steve Hunt, MAWFA's Director of Compliance. As his Declaration (filed herewith) makes clear, Mr. Hunt did not tell the Chapter, or suggest in any way, that it was permissible not to disclose on IRS Form 990s required information about the compensation paid to the Chapter's President & CEO, or to list the amount of that compensation as "$0" or "None."

[2] The Chapter claims in its brief that it has publicity authorizations signed by wish families allowing the release of such confidential information. As explained in the Declaration of Kristen Keck (MAWFA's Senior Manager of Mission Resources), almost 25% of the forms supplied by the Chapter to the Executive Committee did not provide appropriate parental consent to publicity, and the Chapter failed to provide any purported authorizations

**2. Revoking the Chapter's Charter Had Nothing to Do with an Alleged "Consolidation Plan."**

The Chapter claims that its charter was revoked as part of a master plan by MAWFA to "consolidate chapters and control assets" (p. 4). Nothing could be further from the truth.

The only "evidence" (again, without any record support) cited by the Chapter is that the number of Make-A-Wish chapters has decreased from 84 in 2002 (actually, the last time there may have been 84 chapters was in 1998) to 66 at the present time. Contrary to the Chapter's allegations, this decrease is attributable primarily if not exclusively to voluntary decisions on the part of neighboring chapters to merge or consolidate their operations and/or realign their territories in an effort to ensure the Make-A-Wish mission is delivered in the most efficient and effective manner possible. In every case, MAWFA has ensured that donations raised in a chapter's territory are used to grant wishes in that territory, in accordance with the donors' intent. *See* Supp. Mulvihill Decl. ¶ 15.

Consistent with the fiduciary duty it owes to the organization as a whole, MAWFA encourages these types of mergers, consolidations and realignments, particularly when one of the chapters involved is struggling financially or otherwise experiencing problems.

**3. The Chapter is Not Entitled to Arbitrate the Executive Committee's "Final and Unappealable" Revocation Decision, nor is It Entitled to Use MAWFA's Marks.**

The Chapter claims that, notwithstanding the terms of the Chapter Agreement, it has the right to arbitrate the Executive Committee's "final and unappealable" decision (p. 16) and that it is entitled to an injunction while it pursues arbitration.

As fully explained in MAWFA's opening brief (pp. 10-12), the Chapter is advocating an interpretation of the Chapter Agreement which, if accepted, would render meaningless several provisions set forth therein -- including Section 17.3 ("The decision of the Executive Committee on the appeal [of a CPC decision imposing chapter discipline] shall be final and unappealable"),

---

whatsoever for an additional five children identified on the IRS Form 990s. The Keck Declaration is attached to the Supplemental Declaration of David B. Mulvihill, Esq. ("Supp. Mulvihill Decl.) at Ex. Q; *see also* ¶ 5. In accordance with the Court's rules on electronic filing, identifying information about the minor children has been redacted from Ms. Keck's Declaration.

and Section 21.2 ("All disputes between [MAWFA] and Chapter regarding chapter discipline shall be governed exclusively by and within the rules established in this Agreement, Foundation's Bylaws and the Policies").

Not only does the Chapter ignore the plain language of the Chapter Agreement, but, significantly, it also ignores that the CPC revoked its charter (affirmed by the Executive Committee) and, therefore, under the Chapter Agreement, the Chapter has no right to use MAWFA's Marks. The Chapter Agreement states that, "Upon Revocation, all rights and privileges of Chapter shall immediately terminate [and the Chapter shall] [c]ease to use the Marks in any manner whatsoever and Chapter's license to use the Marks <u>shall</u> <u>immediately</u> <u>and</u> <u>fully</u> <u>terminate</u> … ." Sections 14.1 and 14.2(b) (emphasis added). The Chapter has also refused to permit MAWFA representatives to visit its offices -- as is MAWFA's right under the Chapter Agreement even without revocation. *See* Section 5.7.

Numerous courts have held that once a national organization terminates a local chapter, the local chapter's right to use the national's exclusive marks ceases and any continued use subjects a chapter to liability for trademark infringement and unfair competition under the Lanham Act. *See United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 143 (3rd Cir. 1981) ("The United States Jaycees have an exclusive right to the mark" and "is entitled to broad protection," and the revoked local chapter is barred from using the mark); *Kappa Sigma Fraternity v. Kappa Sigma Gamma Fraternity*, 654 F. Supp. 1095, 1100 (D.N.H. 1987) (national organization severed relationship with local chapter and "upon disaffiliation, the licensing arrangement ends; the licensing arrangement at an end, the licensee's right to the trademark also ends, and the mark reverts to the licensor … and any subsequent use by the former licensee constitutes trademark infringement") (internal citations and quotations omitted); *Birthright v. Birthright, Inc.*, 827 F. Supp. 1114, 1135 (D.N.J. 1993) ("[T]he Charter granted by plaintiff constituted a license for the use of the 'Birthright' name. … Thus, once plaintiff revoked its charter, Woodbury Birthright's continued use of the mark was unauthorized").

In the *Jaycees* case, the local chapter claimed its "affiliation" with the national organization was "terminated for … an improper reason" and it should be allowed to continue to use the national organization's marks. 639 F.2d at 143. The district court agreed, even though "[o]rdinarily, a licensee's right to use a licensor's trademark expires with the termination of their agreement." *Id.* The Third Circuit reversed, holding "[t]his we cannot accept" because "a licensor could lawfully terminate a licensee but enforcement [of the licensee's rights to the marks] would be frustrated." *Id.*

Currently, the temporary stay prevents MAWFA from implementing the revocation decision. In the meantime, the Chapter continues to use the Make-A-Wish Marks without authorization (as it has been doing for more than three months since the CPC revoked the Chapter's charter and more than a month since the Executive Committee affirmed the CPC's decision on appeal). Under the Chapter's position, no matter how egregious or detrimental its conduct, a revoked chapter would be able to continue in existence and to use the Marks for an extended period of time while it worked its way through MAWFA's internal discipline process and then proceeded to arbitration outside the organization. This is precisely the outcome rejected by the Third Circuit in *Jaycees*.

The continued unauthorized use of its Marks would surely expose the Make-A-Wish Foundation to the risk of serious, if not irreparable, harm. *See, e.g., Bayshore Group Ltd. v. Bay Shore Seafood Brokers, Inc.*, 762 F. Supp. 404, 408 (D. Mass. 1991), *citing Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 14 (1st Cir. 1986) ("considerable authority exists for the view that the irreparable injury factor is satisfied once the plaintiff demonstrates that the defendant is wrongly trading on the plaintiff's reputation").

**4. The Chapter Did, in fact, "Appear" at the CPC and Executive Committee Hearings, which Took Place during Teleconference Meetings of the Committees.**

Although it raised no such objections prior to or during the hearings before the CPC and/or the Executive Committee, the Chapter now argues that the decisions of the CPC and the

Executive Committee were arbitrary, capricious and otherwise unfair because the Chapter was not permitted to "appear" in person at the hearings, which took place during teleconference (rather than face-to-face) meetings of the committees (pp. 15-16, 20).

The volunteers who serve on the CPC and the Executive Committee are professionals, business executives and community leaders who live throughout the United States. Both committees meet on a fairly frequent basis, generally monthly in the case of the CPC and approximately 7-9 times each year in the case of the Executive Committee. Supp. Mulvihill Decl. ¶¶ 1, 2 & Exs. N, O & P. The Chapter concedes, as it must, that these decision-makers are presumed to act with "honesty and integrity." Opp. at 22. *E.g.*, *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 927 (Del. 2003) ("presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the [organization]") (internal citations and quotations omitted).

Because of committee members' busy schedules -- and in order to avoid using charitable funds to pay the significant costs associated with face-to-face meetings -- the CPC and the Executive Committee conduct their meetings by teleconference (although the CPC tries to hold one face-to-face meeting each year). This practice is in accordance with Arizona law, which expressly permits nonprofit corporations to conduct any and all business during teleconference meetings. *See* A.R.S. § 10-3820(C). The Chapter was informed of this fact before the hearings and did not register any complaint with the procedure. Supp. Mulvihill Decl. ¶¶ 2-4.

Because MAWFA at all times acted pursuant to the Chapter Agreement, the Chapter cannot succeed on any breach of contract claim, or any claim of breach of the covenant of good faith and fair dealing.[3] *See, e.g., Wells Fargo Bank v. Arizona Laborers*, 201 Ariz. 474, 492, 38

[3] The Chapter's citations on pp. 21-23 have no bearing on an internal disciplinary process governed by agreement between nonprofits. Each case concerns state or federal agencies, or court proceedings: *Withrow v. Larkin*, 421 U.S. 35 (1975) (State Medical Examining Board); *In re Murchison*, 349 U.S. 133 (1955) (criminal contempt proceedings); *Offutt v. United States*, 348 U.S. 11 (1954) (criminal contempt proceedings); *Schweiker v. McClure*, 456 U.S. 188 (1982) (Department of Health and Human Services); *Morrissey v. Brewer*, 408 U.S 471 (1972) (parole revocation); *Larue v. Registrar of Motor Vehicles*, 568 A.2d 755 (R.I. 1990) (state agency); *La Petite*

P.3d 12, 30 (2002) (actions "in accord with the terms of one's contract cannot without more be equated with bad faith") (internal citations and quotations omitted) (emphasis in original).

### 5. MAWFA Has Fully Complied with the Temporary Restraining Order.

MAWFA has not taken any measures "to revoke, consolidate, merge or assume ultimate control over" the Chapter since the temporary stay was entered on May 20, 2008. For example, MAWFA has not reassigned the Chapter's territory; required that the Chapter's assets be transferred to the entity that will ultimately assume responsibility for that territory; or taken control over wish referrals or other wish-granting activities. Supp. Mulvihill Decl. ¶ 9.

The Chapter's accusation that MAWFA has withheld funding from a BMW event is flat wrong. MAWFA engaged in a 2007 Holiday Campaign with BMW of North America, LLC, pursuant to which 70% of the funds raised were to be distributed equally among all chapters (not based on location of dealerships as the Chapter claims). On February 26, 2008, MAWFA issued check number 51914 to the Chapter -- including, among other items, the Chapter's equal share of the BMW revenues (i.e., $5,388.24) -- which the Chapter deposited into its bank account. *Id.*, ¶¶ 10, 11 & Exs. R & S.

Due to the issues regarding the Chapter's status, MAWFA has not invoiced the Chapter for its 2008 annual "partnership dues" to MAWFA. The Chapter has also to date failed to pay invoices to MAWFA for its January and March 2008 insurance bills. The Chapter's total outstanding obligation to MAWFA is in excess of $35,000. *Id.*, ¶ 12.

It is not an unusual practice for MAWFA to withhold distributions for chapters with outstanding debts, or to deduct unpaid debts from chapter distributions. Currently, MAWFA is holding one distribution to the Chapter totaling $1,146.20 pending resolution of these issues.

---

*Auberge, Inc. v. Rhode Island Comm'n on Human Rights*, 419 A.2d 274 (R.I. 1980) (state agency); and *Davis v. Wood*, 427 A.2d 332 (R.I. 1981) (state agency).

The net effect of these actions leaves the RI Chapter with more than $30,000 which should, if the Chapter were in normal status, be paid to MAWFA.[4] *Id.*, ¶ 13.

### 6. The Court Should Deny the Chapter's Request to Use Donations to Pay Attorneys' Fees in Connection With this Dispute.

In the last line of its brief, the Chapter requests that the Court grant permission for it to use donated funds for attorneys' fees and costs so it can "defend itself" in an improper arbitration against MAWFA. MAWFA -- which is being represented in this matter on a *pro bono* basis -- strenuously objects to any such use of donor funds in connection with this dispute. Under the terms imposed by the CPC and upheld by the Executive Committee, the Chapter is prohibited from expending funds "other than in the ordinary course of business," or committing to any such expenditure, without MAWFA's prior written approval. Prior to the Executive Committee hearing, MAWFA reluctantly agreed to allow the Chapter to use up to $10,000 if necessary for attorneys' fees and costs. It did so in recognition of the fact that the Executive Committee's decision would be "final and unappealable." Supp. Mulvihill Decl. ¶ 16.

If the Chapter is permitted to proceed to arbitration, such proceedings would take place in Arizona, *see* Section 21.2, and the attorneys' fees and costs incurred would likely be substantial. MAWFA believes that using charitable funds to pay such litigation-related expenses would be a breach of the obligations the Make-A-Wish Foundation (MAWFA and chapters alike) owes to its various constituents, including wish children, donors and the public at large.

[4] The "accrual listing" to which the Chapter refers is the May 31, 2008 accrual report. As a courtesy, MAWFA sends an accrual report to chapters approximately one month prior to the actual payment of funds to allow chapters to accrue the receivable. Although MAWFA did not send a May 31, 2008 accrual report to the Chapter, the May accrual for the Chapter totals $10,796.55. MAWFA continues to track and accrue these expenses as obligations to the Chapter (or whatever entity eventually takes over the Rhode Island territory). In addition, MAWFA continues to track and maintain separate accounting on all donations received and due the Chapter, which it will ensure are used to grant the wishes of children in Rhode Island in accordance with the donors' intent. Supp. Mulvihill Decl. ¶ 14.

## CONCLUSION

For the foregoing reasons, and those set forth in its Memorandum of Law, defendant Make-A-Wish Foundation of America moves that the temporary stay issued on May 20, 2008 by the Providence Superior Court be lifted and that plaintiff's motion for a preliminary injunction be denied.

Respectfully submitted,

**MAKE-A-WISH FOUNDATION OF AMERICA,**

By its attorneys,

/s/*Carol E. Head*
Carol E. Head (#6501)
carol.head@bingham.com
Robert E. McDonnell*
robert.mcdonnell@bingham.com
**BINGHAM MCCUTCHEN LLP**
One Federal Street
Boston, MA 02110
617.951.8000
**admitted pro hac vice*

*Pro Bono Counsel*

*Of Counsel:*
David B. Mulvihill, Esq.
Vice President & General Counsel
Make-A-Wish Foundation of America
3550 North Central Avenue, Suite 300
Phoenix, AZ 85012-2127
Phone: 602.279.9474

Dated: June 20, 2008

**CERTIFICATE OF SERVICE**

I hereby certify that this document has been filed electronically and is available for viewing and downloading from the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, paper copies will be sent to those indicated as non-registered participants, and a courtesy copy will be sent to the Rhode Island Attorney General's Office, on June 20, 2008.

/s/*Carol E. Head*
Carol E. Head (#6501)
**BINGHAM MCCUTCHEN LLP**
One Federal Street
Boston, MA 02110
617.951.8000